OPINION
{¶ 1} Mark Rutledge appeals from his conviction in Montgomery County *Page 2 
Common Pleas Court of possession of crack cocaine pursuant to his no contest plea.
 {¶ 2} The facts surrounding Rutledge's arrest are not essentially in dispute.
 {¶ 3} At approximately 3:40 a.m. on October 15, 2005, Dayton Police Officers Paul Saunders and Brian Dedrick encountered Rutledge driving a white Chevrolet Caprice southbound on Main Street. The officers immediately recognized that the vehicle's window tint violated the law. As a result, Saunders and Dedrick fell in behind Rutledge in order to issue him a citation for a window tint violation. At the time Saunders and Dedrick encountered Rutledge, they sat in their cruiser next to Officers Woods and Heiser, who were in another cruiser. Woods and Heiser fell in behind Saunders and Dedrick during the stop. As the officers prepared to stop Rutledge, Woods indicated to Saunders that she knew Rutledge to be someone who fights with police officers and flees traffic stops. Further, Saunders' on-board computer revealed that the registered owner of the vehicle had been arrested for assaulting a police officer before.
 {¶ 4} Once Rutledge stopped his vehicle, Saunders approached Rutledge's vehicle on the driver's side and Dedrick on the passenger's side. As they did so, Saunders shined his flashlight through the back windshield. The window tint was so dark that Saunders could not see if there were any back seat passengers in the vehicle. In order to ensure their safety, the officers asked Rutledge and his passenger to exit the vehicle. Saunders also asked Rutledge to partially roll his window back up so that he could check the tint. While Saunders did so, Dedrick stood on the sidewalk with Rutledge's passenger, and Woods and Heiser stood with Rutledge near the rear of the vehicle. The tint meter confirmed that the windows were tinted too darkly — they only let in three percent of light. *Page 3 
 {¶ 5} Saunders testified he checked the interior of Rutledge's vehicle for weapons because of Rutledge's history and he felt "it would be unsafe to put him back into a vehicle which we couldn't even see the interior of it and see his actions until I was comfortable there were no weapons within his grasp." (T. 10). Saunders opened the driver's door and reached underneath the driver's seat and between the driver's and passenger's seats looking for weapons. Heiser did the same on the passenger's side. Heiser also opened the glove box, which only opened approximately one and a half inches. Saunders shined his light into the glove box and saw what he recognized to be a large chunk of crack cocaine in a baggie. Once they discovered the crack, the officers placed Rutledge under arrest for possession of the crack, and, without prying the glove box open, the officers used a screwdriver to lift the baggie out.
 {¶ 6} In the trial court, Rutledge moved to suppress the crack cocaine because he contended the police lacked reasonable suspicion to believe he was violating the law regarding tinted windows. Also, Rutledge contended that even if the stop was justified, the search of his vehicle's glove compartment was not. The trial court overruled Rutledge's motion without elaboration.
 {¶ 7} In a single assignment, Rutledge argues the trial court erred in refusing to suppress the cocaine. Rutledge contends Officer Saunders did not have reasonable suspicion to stop him for a window-tint violation because he could not cite that portion of the code which prohibits windows from being too darkly tinted. The following is Officer Saunders' testimony at the suppression hearing:
 {¶ 8} "Q. So what were the lighting conditions like?
 {¶ 9} "A. It was nighttime, sir. It was artificial street lights. *Page 4 
 {¶ 10} "Q. I think you testified that from your visual observation you could tell that the tint was above the legal limit?
 {¶ 11} "A. That's correct.
 {¶ 12} "Q. And what is the legal limit?
 {¶ 13} "A. We have to be able to see inside of the vehicle, the occupants of the vehicle.
 {¶ 14} "Q. That's the legal limit?
 {¶ 15} "A. That is the limit, sir.
 {¶ 16} "Q. What's the citation to that?
 {¶ 17} "A. It's a window tint violation.
 {¶ 18} "Q. And is that what it says in the code?
 {¶ 19} "A. The — when I write on the ticket, it's a window tint violation. And I would have to refer to the code to give you the exact wording.
 {¶ 20} "Q. Based on your experience as an officer, you don't know what the language is?
 {¶ 21} "A. The language we use on our ticket is window tint violation, excess of 50 percent.
 {¶ 22} "Q. So you write excess of 50 percent as the violation on the ticket?
 {¶ 23} "A. Correct, sir.
 {¶ 24} "Q. Do you know whether or not the code reflects that language?
 {¶ 25} "A. I would have to refer to the code to get the exact information on that. *Page 5 
 {¶ 26} "Q. So your answer would be you don't know?
 {¶ 27} "A. My answer is I would refer to the code to get the exact language.
 {¶ 28} "Q. But as you're sitting on the stand, do you know the answer to that question? Yes or no.
 {¶ 29} "A. My understanding of the code is we have to be able to see in the windows.
 {¶ 30} "Q. Okay. So — but-
 {¶ 31} "A. I can't give you the precise language.
 {¶ 32} "Q. So my question is, the 50 percent, is that the language you're aware of that's contained-
 {¶ 33} "A. No. I can testify that that is — that is what I was trained at.
 {¶ 34} "Q. So when you testified that it was in excess of the legal limit based on your observation, is it really your — based on what you thought your training was?
 {¶ 35} "A. That's correct.
 {¶ 36} "Q. Okay. And there was another officer in the cruiser with you?
 {¶ 37} "A. Yes, sir, there was.
 {¶ 38} "Q. And then at that point you decided to initiate a traffic stop for the window tint violation, according to your testimony. Correct?
 {¶ 39} "A. That's correct, sir.
 {¶ 40} "Q. And there were not any other traffic violations you testified to other than the window tint. Is that correct?
 {¶ 41} "A. Not that I observed, sir. That's correct. *Page 6 
 {¶ 42} The State argues that Saunders did have reasonable suspicion because the windows were tested when Rutledge's vehicle was stopped and they allowed only three percent of light through which is far darker than the fifty percent required by law.
 {¶ 43} R.C. 4513.241 (A) provides that window tinting in motor vehicles must allow a light transmittance of not less than fifty percent, plus or minus three percent. See also Ohio Adm. Code4501-41-03(A)(3). Officer Saunders accurately stated the law regarding tinted automobile windows although he could not cite the code provisions. The fact that the windows were discovered to be so dark upon stopping the vehicle supported Saunders' suspicion that Rutledge's vehicle might be in violation of the law.
 {¶ 44} Rutledge contends that even if the officers had grounds to stop his vehicle and ask him and his passengers to exit it, the officers did not have grounds to search his glove compartment. He notes that he did not attempt to evade the officers and he was compliant and non-confrontational in his encounter with the officers. He notes that Officer Saunders admitted that he knew of no weapons-related offenses pertaining to him before the "frisk" of the glove compartment occurred. The State argues that the search of the interior of Rutledge's vehicle was reasonable in light of Rutledge's history and the vulnerability of the officers in light of the vehicle's dark windows.
 {¶ 45} In Michigan v. Long (1983), 463 U.S. 1032, police officers on patrol in a rural area observed a car traveling erratically swerve into a roadside ditch. When they stopped to investigate, Long, the only occupant of the car met them at the rear of his car. When Long, who appeared under the influence of something, turned and began walking toward the open driver's side door of his car, the officers followed and observed a large hunting knife on the driver's side floorboard. The officers patted down Long, *Page 7 
finding no weapons. They then shined a flashlight into the vehicle and saw something protruding from the front armrest. The officer lifted the armrest and saw a pouch of marijuana in plain view. The supreme court granted review to consider the authority of a police officer to protect himself by conducting a Terry-type search of the passenger compartment of a motor vehicle during the investigating stop of an occupant of the vehicle.
 {¶ 46} In upholding the frisk of the front seat, Justice O'Connor wrote as follows:
 {¶ 47} "The circumstances of this case clearly justified Deputies Howell and Lewis in their reasonable belief that Long posed a danger if he were permitted to reenter his vehicle. The hour was late and the area rural. Long was driving his automobile at excessive speed, and his car swerved into a ditch. The officers had to repeat their questions to Long, who appeared to be `under the influence' of some intoxicant. Long was not frisked until the officers observed that there was a large knife in the interior of the car into which Long was about to reenter. The subsequent search of the car was restricted to those areas to which Long would generally have immediate control, and that could contain a weapon. The trial court determined that the leather pouch containing marihuana could have contained a weapon. It is clear that the intrusion was `strictly circumscribed by the exigencies which justified] its initiation.'
 {¶ 48} " * * * In this case, the officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within Long's immediate grasp before permitting him to reenter his automobile. Therefore, the balancing required by Terry clearly weighs in favor of allowing the police to conduct an area search of the passenger compartment to uncover weapons, as long as they *Page 8 
possess an articulable and objectively reasonable belief that the suspect is potentially dangerous.
 {¶ 49} " * * * Just as a Terry suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a Terry suspect in Long's position break away from police control and retrieve a weapon from his automobile. In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. Or, as here, the suspect may be permitted to reenter the vehicle before the Terry investigation is over, and again, may have access to weapons. In any event, we stress that aTerry investigation, such as the one that occurred here, involves a police investigation `at close range,' when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a `quick decision as to how to protect himself and others from possible danger * * * ` In such circumstances, we have not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a Terry encounter."
 {¶ 50} There was nothing about the reason for the stop that indicated Rutledge might be armed and dangerous. Officer Saunders did, however, know as he spoke to Rutledge that he had previously been arrested for assaulting a police officer and who was "someone who fights with police officers." Although Rutledge was cooperative with the police on this occasion, he was to be issued a citation for the tinted-windows violation and would be returning inside a vehicle where his movement would be concealed by the tinted windows of the vehicle. Officer Saunders expressed some concern for his personal safety under those conditions. The standard for performing a *Page 9 
protective search, like the standard for an investigating stop, is an objective one, based on the totality of the circumstances. The rationale behind the protective search is to allow the officer to take reasonable precautions for his own safety in order to pursue his investigation without fear of incident. Terry v. Ohio (1968), 392 U.S. 1 at 24, 30.
 {¶ 51} Although close, we believe the police had a reasonable basis for "frisking" the inter compartment of Rutledge's automobile before returning him to it under all the circumstances confronting them. The cocaine was discovered as a result of that protective search and is admissible. The assignment of error is overruled. The judgment of the trial court is Affirmed.
Wolff, P.J., and Glasser, V.J., concur.
(Hon. George M. Glasser, retired from the Sixth Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio). *Page 1