**The STATE of Ohio, Appellee,**

v.

**WILCOX, Appellant.**

[Cite as *State v. Wilcox,* 177 Ohio App.3d 609, 2008-Ohio-3856.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22308.

Decided Aug. 1, 2008.

610

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Kristen A. Brandt, Assistant Prosecuting Attorney, for appellee.

Anthony R. Cicero, for appellant.

DONOVAN, Judge.

{¶ 1} On March 4, 2007, just before midnight, Officers Saunders and Dedrick were finishing their shift in Dayton's Fifth District when they observed a black Chevy Tahoe parked along the curb near the intersection of Faulkner and Riverview. The back door of the Tahoe was ajar, and a man was observed backing cautiously away from the Tahoe, diagonally across the adjacent parking lot. The officers saw the back door of the Tahoe close. The officers testified that the area where the Tahoe was observed was a high-crime area and that they found the situation to be suspicious. Believing that a robbery had occurred or was about to occur, the officers made a U-turn and went back to investigate. As they were passing the Tahoe, they observed that the windows appeared to be tinted in excess of the legal limit.[1] The officers decided to pull over the Tahoe for the equipment violation.

---

1. This was the testimony of Officer Saunders at the motion-to-suppress hearing. However, a review of the videotape indicates that Officer Saunders initially told the driver that he was pulling him over for having no license plate light.

{¶ 2} Officer Dedrick called the stop in to headquarters and was advised that on the previous night, a black SUV in that area had fled from police. The brake lights of the Tahoe were still engaged, which indicated to the officers that the Tahoe was still in gear. Officer Saunders used the cruiser's PA system to order the driver to turn off the car and come back to the police cruiser. The driver complied and was patted down and placed in the rear seat of the cruiser. Officers Orick and Matthews then arrived at the scene in response to the dispatcher's call for assistance.

{¶ 3} The officers approached the vehicle and saw that there were two passengers inside, including Robert Wilcox, who was the rear-seat passenger. Wilcox was removed by Officer Orick and patted down, and the front-seat passenger was removed by Officer Dedrick and patted down. Officer Saunders testified that it was his practice to remove everyone from an automobile prior to conducting a window-tint test for his and the other officers' safety when the windows were too dark to see inside. He also testified that it was his practice to perform a "lunge"-area search before allowing the passengers to return to the vehicle.[2] He defined this as a search of the areas of the car within reaching distance of the occupants of the car.

{¶ 4} During the lunge-area search, Officer Saunders found a loaded semiautomatic handgun in the console area, which was reachable by any of the occupants of the car. Officer Saunders immediately informed the other officers of his find, and the officers decided to engage in a more thorough pat down of the occupants of the car to ensure that there were no weapons concealed on their bodies. Officer Orick testified that in his experience, large handguns, brass knuckles, knives, and other weapons could be concealed in the groin and buttocks area, which could be missed in a normal pat down. Officer Orick therefore used a technique in patting down Wilcox that he referred to as a "dolphin" or "fin" sweep, in which he used the edge of his hand to brush along the crack of the buttocks. In doing so, he felt a hard object protruding from Wilcox's buttocks. He asked Wilcox three times whether it was a weapon or something that could hurt either him or the other officers. Wilcox was evasive in his response, so Officer Orick began to work the object loose from the outside of Wilcox's underwear. The officer saw white powder come out of the leg of Wilcox's pants, followed by a baggie with large chunks of crack cocaine.

---

2. The video also shows that prior to conducting any sort of testing on the windows, Officer Saunders immediately began his search of the vehicle. The trial court found that the window testing could have been performed on the passenger side of the vehicle when Officer Saunders was out of the view of the camera. The video shows that an officer, possibly Officer Orick, tested the front driver's side window following discovery of the handgun.

{¶ 5} Wilcox was indicted on one count of drug possession in excess of 25 grams but less than 100 grams in violation of R.C. 2925.11(A), a felony of the first degree. A motion to suppress the drugs was filed and a hearing was held on April 18, 2007. At that hearing, Wilcox claimed that the officers violated his Fourth Amendment rights by stopping the vehicle in which he was a passenger without probable cause to believe that a traffic violation had occurred. In support of this, he points to the fact that the cruiser video shows that Officer Saunders did not conduct a window-tint test but instead immediately proceeded to search the vehicle.

{¶ 6} He also claims that the search of the vehicle was illegal because the officers did not have probable cause to search the vehicle as a result of a stop for a window-tint violation.

{¶ 7} After permitting the parties to submit additional briefs, the trial court issued its decision on July 6, 2007, overruling the motion to suppress and finding that both the stop and the search of the vehicle were legal and that the second pat-down of Wilcox was permissible as a search incident to an arrest. Wilcox then changed his plea to "no contest" on July 18, 2007, was found guilty by the court, and was sentenced to three years of imprisonment. A timely notice of appeal was filed on August 2, 2007.

{¶ 8} In a hearing on a motion to suppress, the trial court assumes the role of the trier of fact and is in the best position to resolve issues regarding credibility of witnesses and the weight of the evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 437 N.E.2d 583. An appellate court will not disturb a trial court's decision on a motion to suppress when it is supported by competent, credible evidence. *State v. Retherford* (1994), 93 Ohio App.3d 586, 592, 639 N.E.2d 498. An appellate court's role, while relying on the trial court's findings of fact, is to determine, without deference to the trial court, whether the facts meet the appropriate legal standard. *State v. Morgan* (Jan. 18, 2002), Montgomery App. No. 18985, 2002 WL 63196. Accordingly, conclusions of law are reviewed on a de novo basis. *State v. Keller* (Jan. 14, 2000), Montgomery App. No. 17896, 2000 WL 20873.

## FIRST ASSIGNMENT OF ERROR

{¶ 9} "The trial court erred in failing to find the stop of the vehicle in which appellant was a passenger was in violation of Article I, Section 14 of the Constitution of Ohio, and the Fourth Amendment to the United States Constitution."

{¶ 10} In his first assignment of error, Wilcox claims that the trial court erred in denying his motion to suppress the traffic stop of the Chevy Tahoe. Specifical-

ly, Wilcox asserts that the stop for a window-tint violation was a pretext to stop and search the car, because the video shows that Officer Saunders at no point took any interest in the window tint but proceeded immediately to a search of the vehicle.

{¶ 11} When a police officer stops a vehicle based on probable cause that a traffic violation has occurred, the stop is not unreasonable under the Fourth Amendment of the United States Constitution, even if the officer has some ulterior motive for stopping the car. *Dayton v. Erickson* (1996), 76 Ohio St.3d 3, 11, 665 N.E.2d 1091. "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable, articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary or routine * * *.' It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle." Id. at 7, 665 N.E.2d 1091, quoting *United States v. Botero–Ospina* (C.A.10, 1995), 71 F.3d 783, 787. See also *State v. Desman* (Dec. 31, 2003), Montgomery App. No. 19730, 2003-Ohio-7248, 2003 WL 23169234 (upholding traffic stop of vehicle for improper lane change when police had the vehicle under surveillance at the time for suspected drug activity).

{¶ 12} To have probable cause to issue a traffic citation, an officer must have information that is sufficient in nature and character to warrant a prudent person in believing that a violation of law has occurred. *Brinegar v. United States* (1949), 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879; *State v. Timson* (1974), 38 Ohio St.2d 122, 67 O.O.2d 140, 311 N.E.2d 16. Probable cause is less than the beyond-a-reasonable-doubt standard required for a conviction and less than the amount of evidence necessary to make a prima facie showing of guilt. Id. Probable cause has been defined as a "fair probability" that criminal activity is afoot. *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640.

{¶ 13} In this case, the officers admit that they were suspicious of the Tahoe before they decided to stop it. However, an officer's ulterior motive is irrelevant as long as there is probable cause to stop the car. The officer testified at the motion-to-suppress hearing that they stopped the car for a window-tint violation, and the court found this testimony to be credible. Though Wilcox is correct in pointing out that the video does not indicate any interest in window tint initially, Officer Saunders did advise the driver of the Tahoe that he had been pulled over for having no license-plate light. Either equipment violation was sufficient for the officers to initiate a traffic stop. Further, the driver was cited for both the window tint and for the missing license-plate light. Regardless of

which equipment violation ultimately resulted in the stop, the officers possessed probable cause to pull over the Tahoe for a traffic violation.

{¶ 14} Wilcox's first assignment of error lacks merit.

## SECOND ASSIGNMENT OF ERROR

{¶ 15} "The trial court erred in failing to find that the search of the vehicle in which appellant was a passenger was in violation of Article I, Section 14 of the Constitution of Ohio, and the Fourth Amendment to the United States Constitution."

{¶ 16} In his second assignment of error, Wilcox claims that the internal warrantless search of the vehicle was unconstitutional because the officers did not have a reasonable, articulable suspicion that there was a weapon in the car.

{¶ 17} The United States Supreme Court has found that during an investigative stop, a police officer may conduct a protective search of the interior of the vehicle for weapons. *Michigan v. Long* (1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201. This search is consistent with and is an extension of the principles set forth in *Terry* regarding a frisk of a person. Id.; *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. In order to perform a protective search, the officer must have "a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." Id., quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889; see also *State v. Smith* (1978), 56 Ohio St.2d 405, 10 O.O.3d 515, 384 N.E.2d 280. The search must be limited to those areas in which a weapon may be placed or hidden. Id.

{¶ 18} The standard employed in determining whether a protective search is justified is an objective standard: "[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *State v. Bobo* (1988), 37 Ohio St.3d 177, 178–179, 524 N.E.2d 489, quoting *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889. In determining whether a protective search is objectively warranted, courts look at the totality of the circumstances, as viewed through the eyes of a reasonable and prudent police officer on the scene who must react to events as they unfold. *State v. Andrews* (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271, citing *United States v. Hall* (C.A.D.C.1976), 525 F.2d 857. Courts generally consider factors such as the high-crime nature of the area, the time of day, the experience of the officers involved, whether the officer was away from his cruiser, and suspicious activities by the defendant, such as furtive gestures. *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489; *Andrews*, 57

Ohio St.3d 86, 565 N.E.2d 1271. See also *Smith,* 56 Ohio St.2d 405, 10 O.O.3d 515, 384 N.E.2d 280 (protective search was justified when the police officers saw defendant push something under his seat after car was stopped); *State v. Woods* (1982), 8 Ohio App.3d 56, 8 OBR 87, 455 N.E.2d 1289 (protective search was justified when police had information that defendant was armed and police saw defendant make furtive gesture). But see *State v. Vineyard* (Jan. 11, 2008), Montgomery App. No. 22266, 2008-Ohio-204, 2008 WL 186669 (protective search not justified in stop for tinted windows, even though officer had knowledge that defendant had been implicated in drug information hotline calls, had previously been subject of a search warrant for drugs, recognized principle that drugs and weapons normally go hand in hand, and stop was in high-crime area; trial court was correct in conclusion that these factors were tempered by factors that defendant was cooperative, no weapons or drugs were found during pat-down search, and no information indicated defendant was involved in a drug deal at the time).

{¶ 19} While the nature of an area as a high-crime area is a factor to be considered in determining whether a protective search is warranted, that factor alone is insufficient to justify a protective search. *State v. Jones* (1990), 70 Ohio App.3d 554, 591 N.E.2d 810. Likewise, furtive gestures are also a factor to be considered, but furtive gestures alone will not warrant a protective search. *Bobo,* 37 Ohio St.3d 177, 524 N.E.2d 489. The burden is on the state to show that an officer's suspicion of criminal activity was objectively reasonable based on the totality of the circumstances. *State v. Brown* (Nov. 24, 1993), Montgomery App. No. 13958, 1993 WL 491341. The state must present substantial evidence that demonstrates why the officer believed some specific criminal activity was occurring. Id. An officer's mere recitation that he suspected criminal activity is insufficient. Id. This court recently addressed a very similar case involving the same officers. *State v. Rutledge* (April 6, 2007), Montgomery App. No. 21854, 2007-Ohio-1662, 2007 WL 1053942. In *Rutledge,* the defendant was stopped due to window tint that was too dark. One of the officers recognized the defendant as someone who fights with police and flees traffic stops. The officers asked the defendant and his passenger to exit the vehicle while the window tint was tested. Prior to allowing the defendant back into the car, the officers conducted an internal search of the car in the same manner employed in this case. In upholding the search, this court found that while it was a close issue, the search was justified because of Rutledge's history of violence towards police officers.

{¶ 20} The trial court found that the factors in *Rutledge* were less compelling than the circumstances presented in this case. We conclude that the circumstances in *Rutledge* are more compelling. The search in *Rutledge* was upheld based on the defendant's history of violence towards police officers during

traffic stops. No such compelling factor exists in this case. The factors cited by the trial court include the sighting of the man walking diagonally away from the Tahoe, the high-crime nature of the neighborhood, the vague information about a black SUV fleeing police officers in the area on the previous day, and the fact that the brake lights were still engaged when the Tahoe stopped for the police.

{¶ 21} When asked by the prosecution at the motion-to-suppress hearing why he had performed a search of the vehicle, Officer Saunders initially responded that it is his practice to always search the lunge area of a vehicle stopped for a window-tint violation "[p]rior to letting anybody back in the vehicle, especially a vehicle we can't see in, that's standard." When asked again on cross-examination, Officer Saunders again affirmed that it was procedure to do so:

{¶ 22} "Q: I know you said it was—it was standard procedure for you to search a vehicle with a window tint violation before you put any of those people back in the vehicle; is that correct?

{¶ 23} "A: Yes, sir, prior to putting anybody back in the vehicle, especially a vehicle that I can't see in.

{¶ 24} "Q: So that's why you searched the lunge area in this case?

{¶ 25} "A: That is correct."

{¶ 26} It was not until questioning by the court that Officer Saunders indicated that another reason they searched the vehicle was because they suspected a robbery of the man in the parking lot:

{¶ 27} "THE COURT: * * * And it's your testimony that any time you make a stop anywhere in the city for a vehicle having tinting that perhaps is in violation of the ordinance, that before you can—that before you would allow the occupants of the vehicle to get back in the vehicle you perform a search of what you call the lunge area of the vehicle.

{¶ 28} "THE WITNESS: First of all, every time I do a window tint I have not always had everybody exit. Under these circumstances we would have everybody exit.

{¶ 29} "THE COURT: Right.

{¶ 30} "THE WITNESS: I have in the past. And prior to letting anybody back in that vehicle, yes sir, I would check to make sure that there's no access to a weapon.

{¶ 31} " * * *

{¶ 32} "THE COURT: All right. But the reason for the lunge area search, at least from your perspective, was because of the fact that this was a vehicle that had tinting that appeared to be in violation of the ordinance. And because of

that, and because you did have the occupants of the vehicle get out of the vehicle, because of that you did a search of the lunge area.

{¶ 33} "THE WITNESS: And in addition to the fact that we were at Riverview and Williams and that we thought that we might have had a robbery in progress."

{¶ 34} The trial court correctly acknowledges in its decision that Officer Saunders's "standard" search of the lunge area of a car with tinted windows before allowing occupants to reenter it, without more, is unconstitutional. The court found that Officer Saunders's suspicion of a robbery, coupled with the high-crime nature of the neighborhood, was sufficient to constitute a "reasonable, articulable suspicion." However, the state presented nothing that would reasonably indicate that the man backing away from the Tahoe was being robbed or about to be robbed. Notably, Officer Saunders testified that the parking lot the man was backing across was large, and the man was approximately in the middle of the lot. The back door of the Tahoe was ajar, but it was not completely open. No weapons were observed. No investigation was undertaken regarding the incident. The man was not questioned either before or after the Tahoe was stopped. The court stated that this incident led to the reasonable conclusion that there had been some illegal interaction or some attempted illegal interaction. However, Wilcox points out that this behavior is also consistent with someone yelling to a friend as they back away. The fact that it was cold and snowing that night and the fact that the person was walking backwards could very well account for the cautiousness of the individual's steps. At best, this may contribute to a hunch that something illegal had happened or was about to happen, but a hunch does not rise to the level of particularized suspicion required to search the passenger compartment of the vehicle.

{¶ 35} The state points to no suspicious activity by the occupants of the vehicle other than the car's brake lights remaining lit once the car had stopped, along with information that a black SUV had fled from officers in the area the prior night. While the officers attributed the lit brake lights to the car's remaining in drive once it stopped, the trial judge noted that it could simply mean that the driver's foot remained on the brake pedal once the car was in park. The driver was cooperative when the police ordered him to turn off the car and walk to the police cruiser. All of the passengers were cooperative when they were removed from the car, and no weapons or drugs were found during the pat-down search of the car's occupants. The record is devoid of any evidence that the occupants were known to be violent. The state has pointed to nothing in the behavior of any of the occupants that would lead to the conclusion that any of the occupants were armed.

{¶ 36} Since the state failed to meet its burden that the officers had reasonable, articulable suspicion that there was a weapon in the car prior to the search, Wilcox's second assignment of error is sustained. The judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

WOLFF, P.J., and BROGAN, J., concur.