[Cite as *State v. Ward*, 2017-Ohio-1391.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27030 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-2801 |
| | : | |
| BRIAN J. WARD | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of April, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MEAGAN D. WOODALL, Atty. Reg. No. 0093466, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

THOMAS M. KOLLIN, Atty. Reg. No. 0066964, 2372 Lakeview Drive, Suite H, Beavercreek, Ohio 45431
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Defendant-Appellant, Brian J. Ward, appeals from his conviction and sentence on one count of Possession of Heroin and one count of Tampering with Evidence. Ward contends that the trial court erred in overruling his motion to suppress evidence, because he was unconstitutionally detained by the police and because his consent to search was involuntary.

{¶ 2} We conclude that the trial court did not err in overruling Ward's motion to suppress evidence. Both Ward's initial and second encounters with a police officer were consensual, and Ward voluntarily consented to a search. Furthermore, once the search began, the officer found weapons and had a reasonable, articulable suspicion of danger that would justify seizing Ward and continuing the search.

{¶ 3} Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} The following facts were disclosed at a suppression hearing held in the trial court. The only witness at the hearing was Miamisburg Police Officer, Kevin Current. On July 25, 2015, Current was patrolling an area called the 2-Beat, which was located north of Interstate 75. Current was wearing the uniform of the day and was in a marked cruiser.

{¶ 5} At about 12:35 a.m., while traveling in the area of North 11th Street and Pearl Avenue, Current encountered a man (later identified as Brian Ward), walking north on North 11th Street. This was nothing out of the ordinary and did not concern Current. However, Current had been working in that area for quite a while, knew most of the

residents, and did not recognize Ward.

{¶ 6} When Current first saw Ward, Ward was walking toward him. Current stopped his cruiser and asked Ward who he was and where he was headed. Ward said he was in town from Kentucky and was working in the area for a realtor. Ward also said he was going to a friend's house where he was visiting or staying. The friend was an individual named Ernest W. Current was familiar with Ernest, as the police had dealt with Ernest numerous times for various criminal reasons, including drugs. Current stated that the police had prior drug issues at Ernest's house and also at the house next door.

{¶ 7} Current initially spoke with Ward through the window of his cruiser. He stated that Ward did not smell of alcohol, did not look intoxicated, and did not look as if he were under the influence of drugs.

{¶ 8} After obtaining Ward's social security number, Current pulled up the street and parked his cruiser. He ran Ward's information and found Ward did not have any outstanding warrants. Current then began entering comments to the call screen on his computer. While he did this, Ward continued to walk north on North 11th Street, on the opposite side of the street from the cruiser. When Ward reached the area where Current was parked, Current exited the cruiser and again engaged in conversation with Ward. Because of the location where Ward was headed and the people Ward associated with, Current asked Ward if he had anything illegal. Ward said no. After Ward said no, Current continued to walk towards him. Current then asked Ward if he could "check," and Ward said yes. Transcript of Proceedings, p. 28.

{¶ 9} As the search began, Current noticed box-cutters that were attached to Ward's front pants pockets. The cutters were inside Ward's pockets, and were attached

with a clip on the outside of the pocket. Current's testimony is unclear as to whether he could actually see the box-cutters or could only see the clips on the outside of Ward's pockets. *See* Transcript of Proceedings, p. 29. In this regard, the following exchange occurred:

Q. Now, you said he had these box-cutters affixed to him, to his pants?

A. Yes.

Q. Were they covered?

A. They were in his front pockets with a clip. They have clips, so they were clipped. Like the box-cutter was inside and the clips were on the outside of the pockets.

Q. Okay. And you could see them before you put your hands on them?

A. Yes.

*Id.*

{¶ 10} When Current began to patdown Ward, he got behind him, as he normally does. Once he got to the pocket, he asked Ward if he could remove the box-cutters. Ward said no. Transcript of Proceedings, p. 30. However, when Current explained that he wished to remove the box-cutters for his safety and would return them, Ward agreed. At that point, Current had hold of Ward's arm. He folded Ward's arm away from the box-cutters and removed them.

{¶ 11} Current then continued the patdown and felt gel capsules in the right front pocket of Ward's pants. Current felt them through the outside of Ward's pants, with his

fingers.   Based on his experience in detecting gel caps, Current immediately knew these were gel caps, and concluded that they probably contained heroin.

{¶ 12} Current asked Ward if he could reach in his pocket and remove the gel caps, but Ward said no.   Current then told Ward that he knew Ward had heroin in his pocket. At that point, Ward pulled away from Current and began to run.   Ward ran north towards Ernest's house.   Current then called for help on his portable radio and ran after Ward. He was able to grab Ward's sleeve for a moment, but Ward got away.

{¶ 13} In the area where Ward was stopped, the road runs across a creek, and a little tree-line leads down into the creek bed.   The road forms a bridge across the creek, and Current ran onto the bridge so that he could maintain visual contact with Ward.   Ward ran straight through the tree-line and down to the creek.   Ward was about 10 to 12 feet away, at the bottom of the creek, and Current spotlighted Ward with his flashlight. Current could see Ward clearly, and Ward was pulling items from his right pocket and dropping them in the creek.   At that time, Current was ordering Ward to stop, to keep his hands out of his pocket, and to come out of the creek.   However, Ward continued to pull items from his pocket.

{¶ 14} Once Ward finished dropping items from his pocket, he began to come out of the creek area.   By that time, Officer Priest had arrived on the scene.   Priest detained Ward and placed him in the rear of the cruiser.   Current and Priest then went down to the bottom of the creek to check the area where Ward had been dumping items from his pocket.   They found three gel capsules floating right where Ward had been standing. Current had Latex gloves in his possession and used one to collect the capsules.   Gel capsules are water soluble and they were already beginning to deteriorate when Current

got them into the glove. Another officer then took photographs of the capsules at the scene.

**{¶ 15}** Because Ward was complaining about his arm, medics took him to Sycamore Hospital. Ultimately, Current went to the hospital and questioned Ward after administering Miranda warnings.

**{¶ 16}** Ward was indicted in November 2015 for one count of Possession of Heroin of less than one gram, a fifth-degree felony, and one count of Tampering with Evidence, a third-degree felony. After Ward pled not guilty, he filed a motion to suppress on December 11, 2015. The trial court held a hearing on January 20, 2016, at which the above evidence was elicited from Officer Current. The court overruled the motion to suppress the same day.

**{¶ 17}** On January 27, 2016, Ward pled no contest to both charges, and was found guilty. The trial court subsequently sentenced Ward to up to five years of community control, with various conditions. Ward now appeals from his conviction and sentence.

## II. Alleged Error in Overruling the Motion to Suppress

**{¶ 18}** Ward's sole assignment of error states that:

The Trial Court Erred in Overruling Appellant's Motion to Suppress.

## A. Alleged Unlawful Detention

**{¶ 19}** Ward presents two issues under this assignment of error. The first is that the motion should have been granted because the police unlawfully seized him. Ward acknowledges that the police may validly detain individuals briefly for questioning, but

argues that an unlawful seizure occurred in this case when Officer Current further investigated without reasonable articulable facts giving rise to a suspicion of criminal activity. In contrast, the State contends that Ward's first two encounters with the police were consensual and that the Fourth Amendment was not implicated. In addition, the State contends that Ward consented to the search of his person.

{¶ 20} In its decision, the trial court found Officer Current credible. The court also found that both of Current's initial encounters with Ward were consensual and did not implicate the Fourth Amendment. The court also concluded that Ward's consent was voluntary.

{¶ 21} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted). *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) *Id.*

{¶ 22} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated * * *.' " *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994).

{¶ 23} To decide if "a particular encounter constitutes a 'seizure,' and thus implicates the Fourth Amendment, the question is whether, in view of all the circumstances surrounding the encounter, a reasonable person would believe he or she was 'not free to leave,' *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), or 'not free to decline the officers' requests or otherwise to terminate the encounter.' *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)." *State v. Westover*, 2014-Ohio-1959, 10 N.E.3d 211, ¶ 13 (10th Dist.). If "a reasonable person would feel free 'to disregard the police and go about his business,' * * * the encounter is consensual and no reasonable suspicion is required." *Bostick* at 434, quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). " 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' " *Id.*, quoting *Terry v. Ohio*, 392 U.S. 1, 19, fn. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶ 24} "The United States Supreme Court has identified three categories of police contact with persons. The first is referred to as a 'consensual encounter,' in which there is no restraint on the person's liberty. There need be no objective justification for such an encounter." (Footnote omitted.) *Retherford*, 93 Ohio App.3d at 594, 639 N.E.2d 498. "The second type, called 'detention,' involves a seizure of the individual for a limited duration and for a limited purpose. A constitutionally acceptable detention can occur 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' The third type involves seizures in the nature of an arrest, which may occur only if the police have probable cause to arrest a person for a crime." *Id.* at 594-595, citing

*Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). (Other citations omitted.)

**{¶ 25}** In a consensual situation, "[p]olice officers may approach someone in a public place, identify themselves, ask whether the individual is willing to answer questions, and use any voluntary responses they receive in a criminal prosecution without the Fourth Amendment being implicated." *Retherford* at 595, citing *Royer* at 497.

**{¶ 26}** "A consensual encounter remains consensual even if police officers ask questions, ask to see the person's identification, or ask to search the person's belongings, provided 'the police do not convey a message that compliance with their requests is required.'" *Westover*, 2014-Ohio-1959, 10 N.E.3d 211, at ¶ 15, quoting *Bostick* at 435. (Other citations omitted.) In this regard, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick* at 437, quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

**{¶ 27}** There is no question that Current's initial stop of Ward was appropriate and that the Fourth Amendment was not implicated. This stop ended, however, when Current pulled up the street, found that Ward had no outstanding warrants, and began entering information into the computer. A second interaction then occurred.

**{¶ 28}** In arguing that the second interaction between Current and Ward was unlawful, Ward relies on *United States v. Richardson*, 385 F.3d 625 (6th Cir.2004) and *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997) (*Robinette III*).[1] In

---

[1] This is the last of various decisions in the same case, and, for purposes of clarity, will

*Richardson*, an officer initiated a traffic stop of a car containing four individuals. The officer asked the driver to step out of the car and told him that he was going to issue a warning citation. *Id*. at 628. After asking the driver about his travel plans, the officer gave the driver the citation and shook his hand. The driver then turned around to return to his vehicle. At that point, the officer asked the driver a few more questions and then told the driver to wait or hang out behind while he asked the owner of the car (who was not the driver) for permission to search the car. *Id*. at 627-628. Ultimately, the officer asked the occupants of the vehicle to step outside and when a search was conducted, a gun was found on one of the occupants (not the owner or driver), and that person (Richardson) was subsequently charged with possession of a firearm by a convicted felon. *Id*. at 628.

**{¶ 29}** Richardson filed a motion to suppress in the district court, which was granted, and the United States appealed. *Id*. The Sixth Circuit Court of Appeals noted that once the purpose for a traffic stop has been completed, the police cannot further detain motorists unless something occurred during the stop to cause an officer " 'to have a reasonable, articulable suspicion that criminal activity was afoot.' " *Id*. at 620, quoting *United States v. Hill*, 195 F.3d 258, 264 (6th Cir.1999).

**{¶ 30}** In this vein, the Sixth Circuit Court of Appeals concluded that the traffic stop in *Richardson* ended when the officer gave the driver the citation and shook his hand. *Id*. at 630. At that time, the driver was free to leave, but the officer then asked him to remain behind the vehicle. *Id*. Despite the fact that the officer's demeanor was not coercive, the Sixth Circuit stated that the officer's "words alone were enough to make a

be referenced as *Robinette III*.

reasonable person in [the driver's] shoes feel that he would not be free to walk away and ignore Officer Fisher's request. When the driver is not free to leave, neither are his passengers; indeed, the passengers are at the mercy of any police officer who is withholding the return of their driver." (Citation omitted.) *Id.* at 630. As a result, the court held that a seizure had occurred, and the officer was required to have the required reasonable suspicion for the seizure. *Id.* The court then concluded that under the totality of the circumstances, the officer lacked a reasonable suspicion of criminal activity. As a result, the court affirmed the district court's decision to suppress evidence. *Id.* at 630-631.

{¶ 31} In *Robinette III*, a police office on drug interdiction patrol on Interstate 70 in Montgomery County, Ohio, stopped Robinette, who was speeding. *Robinette III*, 80 Ohio St.3d at 235, 685 N.E.2d 762. The officer had decided to issue only a verbal warning, which was his routine practice for speeders in that construction zone. *Id.* After finding no prior violations, the officer went back to Robinette's car and asked him to step out. The officer then activated his cruiser's video camera, returned to Robinette, issued a verbal warning, and gave Robinette back his license. *Id.* At that point, the officer asked Robinette if he were carrying any illegal contraband, and when Robinette said no, the officer asked if he could search the car. *Id.* Robinette agreed, and the officer found a small amount of marijuana. After finding this, the officer continued the search and found a pill, for which Robinette was charged with a violation of R.C. 2925.11(A). *Id.*

{¶ 32} Initially, the Supreme Court of Ohio held the search invalid as resulting from an illegal seizure, and established a test requiring officers to tell motorists that they are free to go after a detention, prior to further consensual interrogation. *State v. Robinette*,

73 Ohio St.3d 650, 654, 653 N.E.2d 695 (1995) (*Robinette I*). However, the United States Supreme Court rejected this test, stating that "the proper inquiry necessitates a consideration of 'all the circumstances surrounding the encounter.' " *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (*Robinette II*), quoting *Bostick*, 501 U.S. at 439, 111 S.Ct. 2382, 115 L.Ed.2d 389. The court then reversed the decision of the Supreme Court of Ohio and remanded the case for further proceedings. *Id.* at 40.

{¶ 33} On remand, the Supreme Court of Ohio evaluated the case by considering whether the officer was objectively justified in detaining Robinette after administering the verbal warning. *Robinette III*, 80 Ohio St.3d at 240, 685 N.E.2d 762. The court concluded that the drug interdiction policy, pursuant to which the officer had stopped Robinette, promoted legitimate public concerns and justified a brief detention of Robinette to ask if he were carrying any illegal drugs or weapons. *Id.* at 241. The court then stated that "[i]f during the initial detention to ask the contraband question, the officer ascertained reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual." *Id.* Applying this standard, the court held that the officer was not justified in detaining Robinette "to ask for and execute an intrusive search" because the officer "did not have any reasonably articulable facts or individualized suspicion to justify Robinette's further detention * * *." *Id.*

{¶ 34} The State has not argued on appeal that Officer Current had a reasonable, articulable suspicion to justify Ward's further detention, nor did Current testify in the trial court that was the case. Instead, the State simply argues that both encounters were consensual. We agree. Although the initial consensual encounter ended when Current

pulled up the street, parked, found out that Ward had no outstanding warrants, and was entering information into his computer, there is no indication that the second encounter was anything but consensual under the standards set forth above. There was no show of force, nor was there any indication by the officer that Ward was not free to disregard the police and go about his business. *Westover*, 2014-Ohio-1959, 10 N.E.3d 211, at ¶ 15; *Bostick*, 501 U.S. at 437, 111 S.Ct. 2382, 115 L.Ed.2d 389.

{¶ 35} In *State v. Taylor*, 106 Ohio App.3d 741, 667 N.E.2d 60 (2d Dist.1995), we held that "[t]he Fourth Amendment guarantees are not implicated in [a consensual] encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter." *Id.* at 747, citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). *Accord State v. Rappley*, 2d Dist. Montgomery No. 25156, 2013-Ohio-964, ¶ 17.

{¶ 36} There is no indication in the record that Current engaged in physical force or a show of authority, or that a reasonable person in Ward's position would not have felt free to decline Current's request or otherwise end the encounter. Current did not issue any orders, nor did he curtail Ward's freedom in any way when he asked if he could conduct a search. Ward's situation differs from situations like the passenger in *Richardson*, who clearly could not leave the scene, and who was told to remain.

{¶ 37} Accordingly, we agree with the trial court and the State that the Fourth Amendment was not implicated. In *Rappley*, we held that while the defendant's initial encounter with an officer was consensual, the encounter became non-consensual when the officer informed the defendant, without first asking permission, that he was going to

pat him down.   *Id.* at ¶ 23.   We stressed that " 'a reasonable person would not have felt restricted by questions, but would have felt restrained by orders.' "   *Id.*, quoting *State v. Montgomery*, 2d Dist. Montgomery No. 15232, 1996 WL 283943, *3 (May 31, 1996).

**{¶ 38}** In contrast to the officer in *Rappley*, Current did not issue any orders, and did ask permission before conducting a search.   Current did not specifically state that he was going to pat down Ward, but this was the clear implication of his request.

**{¶ 39}** Accordingly, we find no merit in Ward's argument that the two initial encounters with the police were non-consensual.


### B.   Consent

**{¶ 40}** Ward's second contention is that his consent to the search was involuntary. Again, Ward relies on *Robinette III*, and argues that the short transition time between the encounters, coupled with the officer's superior position of authority and the circumstances surrounding the request for the search would compel any reasonable person to submit.

**{¶ 41}** Citing *State v. Sears*, 2d Dist. Montgomery No. 20849, 2005-Ohio-3880, ¶ 37, the trial court concluded that Ward's consent was voluntary because it "was not obtained by force, threat or any claim that if consent had been denied the patdown search would've been conducted in any event."   Transcript of Proceedings, p. 51.

**{¶ 42}** "To rely on the consent exception of the warrant requirement, the state must show by 'clear and positive' evidence that the consent was 'freely and voluntarily' given." *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988), citing *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).   (Other citations omitted.)   This issue of " 'whether a consent to search was in fact "voluntary" or was the

product of duress or coercion, express or implied, is a question of fact to be determined under the totality of the circumstances.' " *Id.*, quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

{¶ 43} "The following factors are generally used in Ohio to decide if a defendant's consent to search has been given voluntarily: '(1) whether the defendant's custodial status was voluntary; (2) whether coercive police procedures were used; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his or her right to refuse consent; (5) the defendant's education and intelligence; [and] (6) the defendant's belief that no incriminating evidence will be found.' " *State v. Mabry*, 2d Dist. Montgomery No. 26242, 2015-Ohio-4513, ¶ 15, quoting *State v. Black*, 2d Dist. Montgomery No. 23524, 2010-Ohio-2916, ¶ 36-41.

{¶ 44} The trial court did not make specific findings on these factors. In situations where a trial court failed to address the totality of the circumstances and to make essential findings on voluntariness, some appellate courts have remanded the case for findings on whether the defendant voluntarily consented to the search. *See, e.g., State v. Limoli*, 10th Dist. Franklin No. 11AP-924, 2012-Ohio-4502, ¶ 36-44. In *Mabry*, we noted that the trial court did not make specific findings as to voluntariness, but decided that the defendant's consent was voluntary because he was not placed in custody, in handcuffs, or in a police cruiser, and because nothing in the record indicated any coercive police procedures. *Id.* at ¶ 18.

{¶ 45} Likewise, there is no reason here to remand, as the record indicates there were no coercive police procedures, nor was Ward placed in handcuffs or in custody in any way. As a result, Ward's consent to the search was voluntary.

{¶ 46} We do note that Ward refused to allow Current to remove the box-cutters from his pocket during the search. The trial court did not discuss this point, and did not consider whether consent was revoked.

{¶ 47} Specifically, during the search, when Current discovered the box-cutters, which were inside Ward's pockets, Ward told Current that he could not remove them. When Ward told Current no, Current "had a hold of [Ward's] arms." Transcript of Proceedings, p. 41. Current then "folded [Ward's] arm back away from the knives." *Id.* Thus, even though consent was initially voluntary, it could be argued that Ward withdrew his consent to the search. *See State v. Jacko*, 2d Dist. Montgomery No. 24371, 2011-Ohio-6494, ¶ 26 (noting that "[a] suspect may revoke his consent to a search or limit the scope of the search to which he consents").

{¶ 48} However, Ward allowed Current to remove the box-cutters after Current explained that it was for Current's safety – again consenting. More importantly, we conclude, under the totality of the circumstances, that by the time Officer Current asked to remove the box-cutters, Current was entitled to do so for purposes of his own safety.

{¶ 49} "A seizure occurs when, in view of all of the circumstances surrounding the incident, the police officer has either by physical force or a show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests and walk away or otherwise terminate the encounter. * * * Factors that might indicate a seizure include the threatening presence of several police officers, the display of a weapon, *some physical touching of the person*, the use of language or tone of voice indicating that compliance with the officer's request might be required, approaching the person in a non-public place, and blocking the citizen's path." (Emphasis added.) *State*

*v. Belcher*, 2d Dist. Montgomery No. 24385, 2011-Ohio-5015, ¶ 22.

**{¶ 50}** The question arises in this context whether Ward was lawfully seized at that point. As was noted, the second type of police contact, "called 'detention,' involves a seizure of the individual for a limited duration and for a limited purpose. A constitutionally acceptable detention can occur 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' " *Retherford*, 93 Ohio App.3d at 594-595, 639 N.E.2d 498. "Without a warrant, probable cause, and/or exigent circumstances, a search of a suspect's luggage (or jacket pockets) is not reasonable." *Id.* at 596, citing *Royer*, 460 U.S. at 497, 103 S.Ct. 1319, 75 L.Ed.2d 229.

**{¶ 51}** "To justify a particular intrusion, the officer must demonstrate 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 11, quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889. "And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate * * *." (Citations omitted.) *Terry* at 21-22. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27. *Accord State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 27 (2d Dist.)

**{¶ 52}** "Courts generally consider factors such as the high-crime nature of the area, the time of day, the experience of the officers involved, whether the officer was away from

his cruiser, and suspicious activities by the defendant, such as furtive gestures." *State v. Wilcox*, 177 Ohio App.3d 609, 2008-Ohio-3856, 895 N.E.2d 597, ¶ 18 (2d Dist.), citing *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988). (Other citation omitted.)

{¶ 53} In this regard, Current did not indicate that the area where the search occurred was a high crime area, nor did he indicate that Ward had made any furtive gestures or was engaged in suspicious activities. In addition, Current had no prior knowledge of Ward, although he was aware that Ward was visiting a place where the place had made prior criminal calls. However, the search occurred late in the evening, and Officer Current was away from his vehicle at the time.

{¶ 54} In addition, during questioning by the trial court, Current stated that he had "some concern" about Ward's access to the box-cutters during the patdown. Once Current discovered the box-cutters, he had "a reasonable, objective basis to reasonably suspect that [Ward] might be armed and dangerous." *State v. Robinson*, 9th Dist. Wayne No. 10CA0022, 2012-Ohio-2428, ¶ 17. *See also State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), paragraph two of the syllabus (noting that "[w]here a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others.")

{¶ 55} Thus, under the totality of the circumstances, we conclude that even if Ward were seized, Current had a reasonable suspicion of danger to himself, and Ward was legally searched.

{¶ 56} After Ward was lawfully searched, he ran from Current and threw the heroin capsules in the creek. As was noted, the trial court held that this constituted voluntary

abandonment. However, we need not consider this point, because we have concluded that the encounters were consensual, that Ward consented to the search of his person, and that even if consent arguably could be said to have been withdrawn, Current had a reasonable, articulable suspicion of criminal activity and danger to himself once he discovered the box-cutters. Accordingly, Ward's Fourth Amendment rights were not violated, and the trial court properly overruled the motion to suppress.

{¶ 57} Based on the preceding discussion, Ward's sole assignment of error is overruled.

## III.   Conclusion

{¶ 58} Ward's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, P.J., concurs.

DONOVAN, J., dissenting:

{¶ 59} I disagree. In protecting individuals from unreasonable searches and seizures, "the Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " *Immig. & Naturalization Serv. v. Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984), quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Encounters between citizens and law enforcement officials fall outside this Fourth Amendment protection when the encounter is inherently consensual in nature, in

that a reasonable person would not feel compelled to respond or engage the officer "beyond the natural sense of obligation almost anyone would feel when a police officer begins asking questions." *Guadalupe v. United States*, 585 A.2d 1348, 1354 (D.C. App. 1991). "Action based merely on whatever may pique the curiosity of a particular officer is the antithesis of the objective standards requisite to reasonable conduct and to avoiding abuse and harassment." *Martinez-Fuerte*, 428 U.S. at 577 (Brennan, J., dissenting).

{¶ 60} In my view, the second encounter between Officer Current and Ward constituted an acquiescent submission to a show of police authority, not a voluntary consensual encounter. In light of the facts in this case, the second encounter falls into the category of a second investigatory detention ("*Terry* stop"). The State concedes that Officer Current did not possess the requisite articulable reasonable suspicion of imminent criminal activity upon engaging Ward the second time. Furthermore, the first stop lacked any reasonable and articulable suspicion of criminal activity.

{¶ 61} As the majority notes, an encounter constitutes a "seizure," implicating the Fourth Amendment, when, in view of all the circumstances surrounding the encounter, a reasonable person would believe he or she was not free to leave. *Mendenhall*, 446 U.S. at 554. Specifically, a "seizure" occurs when "the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded" to police questioning. *Delgado*, 466 U.S. at 216-217.

{¶ 62} In situations involving a vehicular traffic stop, this court has noted that after an officer completes the purpose of the original stop, his "subsequent or simultaneous request to search [a] defendant's vehicle constituted an unlawful continued

detention/seizure of [the] defendant, unless [the officer] possessed a reasonable suspicion that [the] defendant was engaged in some additional criminal activity" beyond that which constituted the reason for the initial stop. *State v. Ferrante*, 196 Ohio App.3d 113, 2011-Ohio-4870, 962 N.E.2d 383, ¶ 21 (2d Dist.). By analogy, this standard should apply to a pedestrian as well.

{¶ 63} In *Retherford*, we observed that:

We think that it strains credulity to imagine that any citizen, directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel "free to leave" or "at liberty to ignore the police presence and go about his business," in spite of being told otherwise, when she is then asked investigatory questions by the officers and faced with a request to search her vehicle for contraband. We think that no reasonable person subjected to a traffic stop would feel free to walk away at any time when she is questioned about and confronted with the suspicion of drug trafficking. We agree that "statements by officers that individuals are suspected of smuggling drugs" are statements which "intimate that an investigation has focused on a specific individual [which] easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention."

(Citations omitted.) *Retherford*, 93 Ohio App.3d at 599, 639 N.E.2d 498. I emphasize, in this case, the officer had no reasonable suspicion of any criminal activity.

{¶ 64} As noted, the same concerns reasonably apply to individuals detained by

an officer on the street, who are first questioned as to their identity, and then, after the officer proceeds down the street apparently satisfied, are again stopped, asked if they are carrying illegal items on their persons, and asked if they will submit to a search. Obviously, "an individual's prior encounters with [] officers should be taken into consideration when determining whether an encounter was coercive or consensual," as successive encounters with police officers would suggest to a reasonable person that he or she is the target of an investigation, and therefore not free to leave. *United States v. Beauchamp*, 659 F.3d 560, 567 (6th Cir. 2011). Courts have acknowledged the "inherently more intrusive and coercive" nature of successive police encounters with an individual, particularly where the subsequent encounter is not justified by any additional information. *See Guadalupe v. United States,* 585 A.2d 1348 (D.C. App. 1991); *United States v. Morin*, 665 F.2d 765 (5th Cir. 1982); *United States v. Ilazi*, 730 F.2d 1120, 1126-1127 (8th Cir. 1984).

{¶ 65} Here, as both parties concede, Officer Current's initial encounter with Ward constituted a "consensual encounter," thereby not requiring any of the minimal reasonable suspicion necessary to justify any "seizure." During this first encounter, Officer Current, acting admittedly on a hunch that something was suspicious because he didn't recognize Ward, asked Ward a series of questions regarding who he was, what he was doing, and where he was going. Tr. 7. Further, Officer Current obtained from Ward his social security number, which was subsequently run through dispatch revealing no outstanding warrants. Tr. 27. Officer Current testified that Ward was fully cooperative and provided him with all the information he had requested. *Id.* After Officer Current had asked this series of questions, ostensibly satisfied, he disengaged with Ward and proceeded to drive

off while Ward resumed walking down the sidewalk. *Id.* At this time, Ward should have been free to proceed uninterrupted from unwarranted police intervention.

{¶ 66} The second interaction between Officer Current and Ward, in my view, constituted a "detainment," thereby invoking Fourth Amendment protection. The circumstances surrounding the second engagement between Officer Current and Ward support a finding that a reasonable person would not have felt free to ignore Officer Current's reengagement and keep walking, nor would they have felt free to ignore Officer Current's unwarranted requests.

{¶ 67} After disengaging with Ward following the initial encounter, Officer Current then reengaged with Ward as Ward became parallel to Officer Current's parked cruiser while walking down the sidewalk on the opposite side of the street. Tr. 27. In contrast to their first encounter, Officer Current immediately got out of his cruiser. *Id.* Officer Current then called out to Ward, asking him if he had anything illegal on him. *Id.* It was at this point that Ward stopped walking and responded that he did not have anything illegal on him. *Id.* Officer Current testified that he then continued his approach upon Ward, asking him if he could "check" if Ward had anything illegal. *Id.* Ward initially responded "yes." *Id.*

{¶ 68} The majority holds that this second encounter was likewise a "consensual encounter." The majority notes that there was no use of physical force or show of authority by Officer Ward that would cause a reasonable person in Ward's position to not feel free to decline Current's requests or otherwise end the encounter, as Current did not "issue any orders" or "curtail Ward's freedom in any way" when he asked to conduct the search. Majority Opinion, ¶ 36.

{¶ 69} However, in my view, the totality of the circumstances surrounding this successive encounter indicates that a reasonable person in Ward's position would not have felt free to ignore Officer Current's requests or otherwise disengage. Considering the short amount of time following the disengagement before Officer Current reengaged Ward, compounded with the enhanced nature of Officer Current's actions initiating this reengagement, including getting out of his cruiser, yelling across the street, asking inherently accusatory questions absent any reasonable and articulable suspicion of wrongdoing, and approaching Ward while continuing to ask questions, a reasonable person in Ward's position would not have felt free to simply ignore Officer Current's requests or walk away. The actions of Officer Current upon this reengagement strongly communicate the message that Ward would not be free to leave until Officer Current's curiosity was satisfied. In fact, the implicit message was that Ward was not entirely free to leave after the first encounter.

{¶ 70} These actions by Officer Current constituted a show of police authority that unequivocally restrained Ward's liberty and therefore implicated the Fourth Amendment. Any act of agreement or consent by Ward upon this successive engagement was not voluntarily and freely given, but constituted an acquiescence to a show of police authority that merely served as "an expression of futility in resistance to [such] authority." *Beauchamp,* at 572. The cumulative coercive effect of a reengagement under the circumstances of this case vitiated any consent to the encounter that Ward could have given.

{¶ 71} Because the State concedes that Officer Current did not have reasonable articulable suspicion to stop Ward, the second encounter between Officer Current and

Ward, in my view, was an illegal seizure under the Fourth Amendment.

{¶ 72} The next issue was whether Ward's consent to Officer Current's search of his person was a valid waiver of Ward's constitutional rights against warrantless searches. *See State v. Akron Airport Post No. 8975*, 19 Ohio St.3d 49, 51, 482 N.E.2d 606 (1985). "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *State v. Scarberry*, 10th Dist. Franklin No. 15AP-775, 2016-Ohio-7065, ¶ 18, quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Regardless of whether the consent is given during a lawful or unlawful detention, courts must examine the totality of the circumstances in determining the voluntariness of the consent to the search. *Robinette III*, 80 Ohio St.3d 234, paragraphs two and three of the syllabus. "The totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." *Id.*, at paragraph three of the syllabus. When a person is lawfully detained, the State must show by clear and convincing evidence that his or her consent to search was freely and voluntarily given. *Scarberry*, at ¶ 19. However, when a person's consent to search is obtained after illegal police activity, such as an illegal seizure, the State must meet a more stringent standard. *Id.* at ¶ 20. Because "an illegal detention presumptively nullifies any consent that is a product of the detention," *Ferrante* at ¶ 28, the consent will be held voluntary "only if there is proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of the prior illegal action." *Retherford* at 602, citing *Royer* at 501. "Factors to consider in determining whether the consent is

sufficiently removed from the taint of the illegal police activity include the length of time between the illegal activity and the subsequent search, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct." *State v. Alihassan*, 10th Dist. Franklin No. 11AP-578, 2012-Ohio-825, ¶ 26.

**{¶ 73}** Because the trial court in this case found both encounters between Officer Current and Ward to be consensual, lawful encounters, the court did not make any specific findings concerning the voluntariness of Ward's consent to the search. Instead, as the majority notes, the court cited *State v. Sears*, 2d Dist. Montgomery No. 20849, 2005-Ohio-3880, and stated simply that Ward's consent was voluntary because it "was not obtained by force, threat, or any claim that if consent had been denied, the patdown would have been conducted in any event." Tr. 51.

**{¶ 74}** However, *Sears* does not apply. Unlike the present case, we concluded in *Sears* that the detention for the patdown search was lawful, because the defendant's "furtive, suspicious movements inside the vehicle created a reasonable suspicion that he might be armed and posed a danger to the officers." *Sears* at ¶ 33. We found that the defendant's consent to the removal of spoons from his pocket was voluntary because the consent was not the product of physical force, a threat of physical force, or an assertion that the officer would, in any event, have lawful authority to remove the spoons. *Id*. at ¶ 37-39. In contrast, the search in this case was not conducted as a lawful search for weapons incident to arrest, as was the case in *Sears*. Moreover, the specific facts surrounding the consent to search in this case differ from those in *Sears*. *Sears* involved the defendant's consent to the removal of spoons, not the search of his person. Further, there was no allegation that the officers in *Sears* ever physically restrained the defendant

upon requesting the consent at issue, whereas in this case, Officer Current testified to restraining Ward's arms behind his back until Ward eventually "allowed [him] to remove [the box-cutters]." Tr. 31.

{¶ 75} Accordingly, the circumstances surrounding Ward's consent to Officer Current's search of his person, in my view, support a finding that Ward's consent was invalid. The cumulative coercive effect of the successive engagement and Officer Current's increased assertiveness toward Ward would cause a reasonable person to believe that he or she could not reject the officer's request to search. Moreover, under the above-mentioned standards, Ward's consent to the search was not removed at all from the taint of the illegal detainment, and, in fact, occurred contemporaneously.

{¶ 76} Assuming, arguendo, that Ward's initial consent to the search of his person was valid, Ward subsequently withdrew that consent. *See State v. Jacko*, 2d Dist. Montgomery No. 24371, 2011-Ohio-6494, ¶ 26 (noting that "[a] suspect may revoke his consent to a search or limit the scope of the search to which he consents."). An individual need not expressly revoke their consent, and may do so impliedly. *Id.* at ¶ 29. Here, Ward explicitly told Officer Current that he could not remove the box-cutters from his pockets, and it is clear that his consent to continue the unwarranted search was necessarily withdrawn at this point. The fact that Ward eventually "allowed" Officer Current to remove the box-cutters after Officer Current explained that it was for his safety does not indicate that any further consent at this point was voluntary or sufficiently removed from the detention. The majority states that at the time Officer Current asked to remove the box-cutters, "Current was entitled to do so for purposes of his own safety," and that "Current had a reasonable, articulable suspicion of criminal activity…once he

discovered the box-cutters." However, it is important to note that Officer Current testified that Ward had not done anything wrong/criminal prior to him finding the gel caps, and that if Ward had not allowed him to remove the box-cutters, Officer Current would have continued the patdown anyway. Also, the State concedes that there was no reasonable, articulable suspicion of criminal activity at this point, as Officer Current did not discover the gel caps until after removing the box-cutters from Ward's pockets. An inquiry from the trial court to Officer Current during the suppression hearing further establishes that there are no charges associated with the box-cutters, and Officer Current testified that he intended to return them to Ward upon the completion of the search. Tr. 31. Box-cutters are not a deadly weapon per se, and the State had absolutely no evidence they were possessed, used, or carried as a weapon, thus the presence of this common work tool does not constitute reasonable, articulable suspicion of any crime.

{¶ 77} Moreover, Ward was unquestionably seized at this point, as Officer Current physically took hold of Ward's arm and folded it back. A reasonable person would not feel free to decline the officer's request and walk away when physically restrained in this manner. Accordingly, there was no consent to continue the patdown beyond the point at which Officer Current asked to remove the box-cutters and physically restrained Ward.

{¶ 78} Finally, in my view, I would find that Ward did not voluntarily abandon the gel caps. This court has stated that "[w]hen a person disposes of or abandons property in response to illegal police conduct, such as an illegal seizure or search, that person is not precluded from challenging the admissibility of the evidence because his act of abandonment is not voluntary and is a product or fruit of that illegal police conduct." *State v. Cosby*, 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 32 (2d Dist.). "The

test for voluntary abandonment involves a determination of whether the abandonment was a product of the illegal stop and seizure of defendant." *Id.* at ¶ 33. Here, Ward's abandonment of the gel caps was clearly in response to Officer Current's illegal search and seizure. Thus, I would hold that Ward did not voluntarily abandon the gel caps, and that they constitute products of Officer Ward's illegal police conduct. Accordingly, I would reverse.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck, Jr.
Meagan D. Woodall
Thomas M. Kollin
Montgomery County Common Pleas Court
c/o Hon. Mary Katherine Huffman, Administrative Judge