[Cite as *State v. Scott*, 2014-Ohio-4963.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

STATE OF OHIO                                            :

    Plaintiff-Appellee                           :   C.A. CASE NO.    2013 CA 104

v.                                                      :   T.C. NO.    13 CRB 1497

STEVEN J. SCOTT                              :   (Criminal appeal from
                                       Municipal Court)
    Defendant-Appellant                        :


                                     :

. . . . . . . . . .

## **O P I N I O N**

Rendered on the     7th     day of     November    , 2014.

. . . . . . . . . .

MARC T. ROSS, Atty. Reg. No. 0070446, Prosecutor's Office, 50 E. Columbia Street, 4th Floor, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

WILFRED L. POTTER, Atty. Reg. No. 0029121, 234 N. Limestone Street, Springfield, Ohio 45503
      Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

{¶ 1} Steven J. Scott was found guilty of menacing by a jury in the Municipal Court of Clark County. The trial court sentenced him to 30 days in jail, with 25 days suspended on the condition that he not engage in similar conduct in the future, and imposed a fine of $250. The trial court stayed the sentence pending appeal.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3} Scott's conviction arose from an encounter with a North Hampton police officer on Sunday morning, March 24, 2013, around 11:00 a.m. As Scott was driving through town, his vehicle came to the attention of Officer Thomas Carpenter, because Carpenter believed that the windows of the vehicle exceeded the allowable level of tint. As Carpenter initiated a traffic stop, he ran the car's license plate and discovered that the owner's driver's license was under suspension, and this suspension became the focus of his investigation.

{¶ 4} During the traffic stop, Scott called Carpenter names and threatened to harm him by running him over with his vehicle or "beat[ing] [his] punk ass." Scott felt that he was being harassed and treated badly by the North Hampton police department.

{¶ 5} At the time of the traffic stop, Scott was cited only for driving under suspension. However, Officer Carpenter had been "shaken up" by the incident and, after consulting with his supervisor and talking with detectives, Carpenter filed a complaint against Scott for aggravated menacing. The charge of driving under suspension was eventually dismissed, and the matter proceeded to a jury trial on aggravated menacing.

Scott filed pretrial motions to suppress evidence and to compel discovery, in addition to that already provided by the State, related to Scott's prior encounters with the police. The motions to suppress and to compel discovery beyond that which had already been provided were overruled after a hearing.

{¶ 6} A jury trial was held on October 31, 2013, at which Officer Carpenter and Scott testified. Video and audio recordings of the traffic stop were also played for the jury. At Scott's request, the jury was instructed on the offenses of menacing and disorderly conduct, as well as aggravated menacing. The trial court instructed the jury that it should deliberate the offenses in decreasing order of seriousness – aggravated menacing, then menacing, then disorderly conduct – and should proceed to consider the next offense only if it found Scott not guilty of the greater offense(s). Nonetheless, the jury returned a not guilty verdict on aggravated menacing and guilty verdicts on menacing and disorderly conduct. In its judgment entry, the trial court convicted and sentenced Scott only on the offense of menacing. Scott was sentenced as described above.

{¶ 7} Scott raises five assignments of error on appeal. Scott's first three assignments of error concern related issues, and we will address them together. They state:

**The trial court erred when it failed to grant the motion of Appellant to suppress his arrest.**

**The trial court erred as a matter of law by ruling that State did not need to produce official police records pursuant to the discovery request for the records of past contacts between the defendant and North Hampton Police Department.**

**The defendant was denied due process and a fair trial when the trial court did not order discovery of North Hampton Police Records for use at his jury trial because of prior contacts that would possibly show officer knowledge of insurance.**

{¶ 8}     Scott's first three assignments of error challenge the trial court's rulings on his pretrial motions to suppress and to compel the production of additional discovery. These motions were addressed at a hearing on August 1, 2013.

{¶ 9}     "A 'motion to suppress' is defined as a '[d]evice used to eliminate from the trial of a criminal case evidence which has been secured illegally, generally in violation of the Fourth Amendment (search and seizure), the Fifth Amendment (privilege against self-incrimination), or the Sixth Amendment (right to assistance of counsel, right of confrontation etc.), of U.S. Constitution.'   Black's Law Dictionary (6 Ed.1990) 1014. Thus, a motion to suppress is the proper vehicle for raising constitutional challenges based on the exclusionary rule first enunciated by the United States Supreme Court in *Weeks v. United States* (1914), 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, and made applicable to the states in *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081."   *State v. French*, 72 Ohio St.3d 446, 449, 650 N.E.2d 887, 890 (1995).

{¶ 10}     In his motion to suppress, Scott argued that his statements, as well as the "[o]bservations and opinions of the police officer(s)" who stopped and "arrested" him, should be suppressed because 1) there was not probable cause to stop, detain, or arrest him; 2) his statements were obtained in violation of his Fifth and Sixth Amendment rights; and 3) the police were engaged in selective prosecution.   However, the evidence presented at the

suppression hearing was not directed to these issues.

{¶ 11}    Police Officer Thomas Carpenter testified that, when he saw Scott's car, he suspected Scott's vehicle of a window tint violation (which initially drew his attention to the vehicle) and that, when he ran Scott's license plate number, the cruiser's computer indicated that the owner of the car did not have a valid driver's license.  Carpenter initiated a traffic stop on these bases.

{¶ 12}    A police officer may stop and detain a motorist when he or she has a reasonable and articulable suspicion that the motorist has committed, is committing, or is about to commit any criminal offense, including a traffic offense, and no independent reasonable and articulable suspicion of other criminal activity is required under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  *State v. Stewart*, 2d Dist. Montgomery No. 19961, 2004-Ohio-1319, ¶ 13; *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996).  "'Reasonable, articulable suspicion' is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'"  *State v. Fears*, 8th Dist. Cuyahoga No. 94997, 2011-Ohio-930, ¶ 7, citing *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).  The trial court reasonably concluded that Officer Carpenter had a reasonable, articulable suspicion of a window tint violation and that the owner of the vehicle was driving under suspension, either of which was sufficient to justify the traffic stop.  Probable cause was not required, as Scott's argument suggests, and we need not address whether probable cause existed.

{¶ 13}    Scott was not ordered out of his car during his encounter with Carpenter; he was issued a traffic citation for driving under suspension, was allowed to park his vehicle off

the road, and was allowed to leave the scene as soon as a friend or relative could pick him up. He was never in custody or under arrest. He was charged with aggravated menacing about three weeks later based on his conduct and comments during the traffic stop. Thus, Scott's argument that his "arrest" should have been suppressed is inconsistent with the facts of this case and is without merit. In fact, he "withdr[ew] the whole issue with regard to custodial interrogation" at the suppression hearing, a fact which is not acknowledged in his brief.

{¶ 14} Scott also argues that the police were engaged in "selective prosecution," by which he seems to mean that he was repeatedly targeted for traffic stops and/or arrests by the police of North Hampton. This argument relates to his motion to compel additional discovery, which was heard on the same day as his motion to suppress, but was not related to the issues raised in his motion to suppress. Scott believed that his prior encounters with police were relevant, because they helped to explain his angry reaction to the traffic stop. During discovery and at the hearing, Scott requested records from the police department for all of his arrests, as well as all incident reports of other contacts with the police, for a period of several years, to show "how frustrated he was" and that he acted "under extreme provocation."

{¶ 15} The prosecutor stated that the police department had checked its records, as well as those of the Sheriff's Department, for any contacts with Scott, by name, Social Security number, and driver's license number, and that the State had provided those records to the defense. The prosecutor further stated that the records had been provided back to 2002, which was five years more than what Scott had requested.

{¶ 16} At the hearing, Scott asserted that additional records – namely "contacts" rather than "arrests" – existed and had not been produced by the State. Defense counsel argued that records of every contact were "absolutely essential to the defense," because he intended to argue that Scott "acted under extreme provocation and stress" when he did things he should not have done. Defense counsel claimed that the requested records would "collaborate" Scott's testimony as to the number of times he had been stopped and "how they occurred." The State denied that additional records existed.

{¶ 17} Based on the records it had already provided to the defense, the State commented that Scott had had "incredible contact with court systems all over southwest Ohio." It argued that none of this information was relevant to the charge in this case and that it was "absurd," after "so much contact with so many different courts," for Scott to "come in and say that I'm under extreme duress because I got pulled over in North Hampton." The State also asserted that it had provided the defense with all documents related to the events of March 24.

{¶ 18} In overruling the motion to compel, the trial court noted that it was "highly unusual for defense counsel to be eager to put before a jury his client's prior criminal record." The court concluded that "no outside evidence * * * would go to [Scott's] state of mind"; rather, such evidence would have to come from Scott himself. The trial court found that Scott had not presented any law in support of his request, and it denied Scott's motion to compel additional information about his contacts with the police in previous years, beyond what had already been provided by the State.

{¶ 19} "The granting or denial of a motion to compel discovery is reviewed under

an abuse-of-discretion standard. The inquiry is whether the trial court's decision is unreasonable, arbitrary, or unconscionable." *State v. Mahan*, 8th Dist. Cuyahoga No. 95696, 2011-Ohio-5154, ¶ 14, citing *State ex rel. The V Cos. v. Marshall*, 81 Ohio St.3d 467, 469, 692 N.E.2d 198 (1998). Under the facts of this case, the trial court's denial of Scott's request to compel additional discovery related to his prior encounters with the North Hampton police or elsewhere was not unreasonable.

{¶ 20} Finally, Scott argues in his brief, as he did at the suppression hearing, that Officer Carpenter's prior contact with Scott should have led Carpenter to question the information he obtained from his computer about the status of Scott's driver's license. The prior contact in question consisted of a traffic stop approximately six months before this incident, in which Scott, while driving a different vehicle, was warned by Carpenter that his trailer hitch interfered with the visibility of his license plate. Scott was not cited, and Officer Carpenter testified that Scott had "satisfied" Carpenter's question at that time about the status of his insurance.

{¶ 21} At the suppression hearing, defense counsel's questioning of Carpenter on cross-examination suggested that Carpenter should have known or suspected, from this prior interaction, that there had been a mistake in the BMV computer system with respect to whether Scott was insured on March 24, 2013, and therefore that Carpenter should have known that there was not "probable cause to stop" or cite Scott for a license suspension. Carpenter responded that he had issued the citation for driving under suspension based on the information his computer provided on March 24. Scott argued, without offering any evidence, that his suspension had resulted from an error on the part of the BMV or another

police department.

**{¶ 22}** When defense counsel suggested that "this officer had personal information that [Scott] was not uninsured," despite what the BMV records stated on March 24, the court observed that, although Scott may have had insurance six months earlier, subsequent events might have changed his status. The court found the defense's line of questioning to be "irrelevant," concluding that "when he [Carpenter] got information off his computer that the man's [Scott's] license was suspended," Carpenter acted reasonably in continuing his investigation.

**{¶ 23}** On the morning of trial, the issue of Scott's prior encounters with the police was raised again. The court held that Scott was free to testify about his prior encounters with North Hampton police, and that he could question Carpenter about his prior encounter(s) with Scott, but that Carpenter could not be questioned more broadly about Scott's other interactions with the North Hampton police force. Scott cross-examined Carpenter about the traffic stop and confrontation at issue in this case and about the prior warning issued to Scott by Carpenter regarding his trailer hitch; he did not attempt to question Carpenter about any other traffic stops.

**{¶ 24}** The trial court did not abuse its discretion in concluding that Officer Carpenter's knowledge of Scott's insurance status several months prior to the traffic stop in question was irrelevant to the issues presented in this case.

**{¶ 25}** The first, second, and third assignments of error are overruled.

**{¶ 26}** Scott's fourth assignment of error states:

**The jury's decision was against the manifest weight of the evidence.**

{¶ 27} At trial, Officer Carpenter testified that, on Sunday, March 24, 2013, when he had been on the North Hampton police force on a part-time or full-time basis for about 2½ years, he observed Scott driving a black Dodge Challenger in North Hampton. Carpenter's attention was drawn to the vehicle because of its dark window tint, which "appeared to be less than the 50% in transmission allowed by law." Carpenter turned his cruiser around to follow the Challenger and turned on his overhead lights; the Challenger pulled over on West Clark Street. Carpenter ran the vehicle's plates before approaching the driver. When he did so, Carpenter learned that the registered owner of the vehicle (Scott) was under suspension. The computer indicated that the suspension began on March 8, 2013, and continued indefinitely.

{¶ 28} When Officer Carpenter approached the vehicle, Scott, the driver, was "very gruff" and demanded to know what he had done. When told about the suspension, Scott said, "That's bullshit." Scott's tone was loud, harsh, and aggressive, and he called Carpenter several offensive names. According to Carpenter, Scott also threatened to "sue us mother f\*\*\*ers, referring to the village."[1] Video and audio recorders on Carpenter's person and in the cruiser recorded this encounter. When Carpenter checked the driver's license and proof of insurance produced by Scott in the computer, he received confirmation that Scott's driving

---

[1] Because our opinions are widely available online, we have chosen to insert asterisks into certain offensive words that appear in the transcript of this case and in other cases.

privileges were suspended. Carpenter cited Scott for driving under suspension and told Scott that someone would need to pick him and the vehicle up.

{¶ 29} After Officer Carpenter issued the citation, Scott stated that he "ought to beat [Carpenter's] punk ass," that Scott was going to "flip [Carpenter] off" every time he came through town, and that he would "run over" Carpenter if he got the opportunity to do so. Carpenter testified that he had believed Scott's threat "that he would run over me * * * [b]ecause the opportunity is there." When Carpenter explained to Scott that he (Scott) would need to appear in court, Scott responded that he "wasn't gonna appear anywhere" and that he was going to get a lawyer.

{¶ 30} Carpenter had never experienced such an encounter previously. Carpenter testified that he had had the authority to arrest Scott the day of the incident, but that he had not done so because Carpenter did not have a more experienced officer with him, because of Scott's attitude and demeanor, and out of concern that the situation would further escalate if Carpenter attempted to make an arrest. After the traffic stop ended, Carpenter called his supervisor to discuss the situation due to the threats Scott had made; Carpenter decided to file a charge against Scott for aggravated menacing.

{¶ 31} Carpenter described having had only one prior contact with Scott, in the fall of the previous year, when Carpenter had issued a warning to Scott that his vehicle's "ball hitch [was] obstructing his license plate." Scott was driving a different vehicle at that time, and he was not cited for driving under suspension. Carpenter testified that Scott had been polite on that occasion.

**{¶ 32}** On cross-examination, Carpenter testified that he had consulted with his supervisor after the incident with Scott, because he had been uncomfortable about Scott's comments and was unsure how to proceed. Carpenter acknowledged that, during the traffic stop, he had allowed Scott to move his vehicle before he left the scene, notwithstanding his threats, while Carpenter stood nearby.

**{¶ 33}** The video and audio recordings of the incident were played for the jury as part of the State's case.

**{¶ 34}** Scott testified for the defense. He stated that he had been "picked up" in the North Hampton area 17 times and had been warned by Officer Carpenter, in particular, "probably" five times since July or August of 2012, including twice within one month. He testified that he had been pulled over by Carpenter while driving several different vehicles. Scott stated that at least two of these encounters had lasted an hour and a half, during which he had been "chewed on" or lectured about his "attitude."

**{¶ 35}** According to Scott, the financial responsibility suspension for which he was cited on March 24, 2013, resulted from a German Township police officer's failing to write down the insurance information that Scott had shown to him, so there had been "a mistake by the BMV." Scott conceded that he had not behaved "very professional" on the day of the traffic stop at issue in this case, but asserted that he had "had every ticket there is" in North Hampton, whereas he did not get pulled over in other jurisdictions. He testified that his frustration had led him to threaten to sue Officer Carpenter and to run him over, but pointed out that he also

said that he was not going to come through North Hampton again. Scott pointed out that he could have hit Officer Carpenter while he was moving his car that day, but stated that he had never had any intention to do so.

{¶ 36} On cross-examination, when questioned about the number of previous encounters he had had with Officer Carpenter, Scott claimed to have been threatened by Carpenter with a gun for a turn signal violation. Although he repeatedly stated that the officers of North Hampton "all look the same," he was sure that Carpenter was the one who had threatened him with a gun; he could not provide a timeframe or identify where in the series of five or more alleged encounters that incident had fallen. When questioned about a BMV printout related to whether his license was under suspension as of March 8, 2013, Scott acknowledged that the BMV report upon which Carpenter had relied indicated that he (Scott) was under suspension as of March 24, 2013. Scott also acknowledged that, in April 2013, the prosecutor had dismissed the charge of driving under suspension because Scott had "taken those steps" to "clear" his license, but he expressed uncertainty about the prosecutor's assertion that the dismissal of the charge did not mean he had not been driving under suspension prior to that time. Scott maintained that he thought he had had a valid license in March 2013, but he was unable to explain where the mistake had been made that caused him to be placed under suspension in the BMV system. Although Scott suggested several times that the origin of his suspension had been with a mistake by the German Township police, he testified that he had not had problems with any police department other than North Hampton.

{¶ 37}    Although Scott was charged with aggravated menacing, the jury was instructed on three offenses: aggravated menacing, menacing, and disorderly conduct.   In pertinent part, aggravated menacing is defined as "knowingly caus[ing] another to believe that the offender will cause serious physical harm to the person or property of the other person."   R.C. 2903.21(A).   The definition of menacing is the same, except that it requires only the fear of physical harm, rather than *serious* physical harm.   R.C. 2903.22(A).   The statute defining disorderly conduct states that "[n]o person shall recklessly cause inconvenience, annoyance, or alarm to another by * * * [e]ngaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior."   R.C. 2917.11(A)(1).

{¶ 38}    The two witnesses who testified at trial – Officer Carpenter and Scott – presented very different and conflicting accounts of their past interactions. However, their testimony was consistent that, on the day of the incident for which he was charged, Scott had threatened to run over Carpenter and to harm him by other physical means.   Based on the evidence presented, the jury could have reasonably concluded that Scott was guilty of menacing or disorderly conduct, the two offenses for which they returned guilty verdicts, and that his prior encounters with police had not justifiably "provoked" these threats (assuming, arguendo, that this would be a defense).   Thus, his conviction was not against the manifest weight of the evidence.

{¶ 39}    The fourth assignment of error is overruled.

{¶ 40}    Scott's fifth assignment of error states:

**The trial court erred as a matter of law by not ruling that**

**the State had failed to prove the charges and by failure to remand to the jury to decide between menacing and the disorderly conduct.**

{¶ 41}   As discussed above, at Scott's request, the trial court instructed the jury on aggravated menacing, menacing, and disorderly conduct.   It further instructed the jury that it should consider Scott's guilt of the offense of menacing only if it found Scott not guilty of aggravated menacing and, likewise, that it should consider the offense of disorderly conduct only if it found Scott not guilty of menacing.   It is apparent that the jury did not strictly comply with these instructions, because its verdict forms found Scott not guilty of aggravated menacing, but guilty of both menacing and disorderly conduct.   When the verdicts were read, neither of the parties nor the court addressed the fact that the jury had entered a verdict on the offense of disorderly conduct, notwithstanding its verdict of guilty on menacing.   In its judgment entry, the trial court stated:

> The jury acquitted the defendant of Aggravated Menacing, but found him guilty on the lesser-included offense of Menacing.   The jury also found the defendant guilty of Disorderly Conduct.   Given that the Court's instructions were such that in the event the jury convicted on menacing, they should not have considered the offense of disorderly conduct, the Court hereby sets aside the guilty finding as to that offense.

{¶ 42}   On appeal, Scott asserts, for the first time, that the trial court should

have "remanded" and asked the jury to choose the proper verdict. He cites no authority for this position. The State contends that, because Scott failed to object to the form of the verdicts when they were read, we must review for plain error, and no plain error exists.

{¶ 43} The trial court was confronted with a circumstance in which the jury had not completely followed its instructions; however, it was clear what the outcome would have been if the jury had followed the instructions. Disorderly conduct is a lesser included offense of menacing. Having found Scott guilty of menacing, the jury should not have considered the lesser included offense of disorderly conduct but, in any event, its verdict on the count of disorderly conduct was superfluous. Moreover, the jury was discharged before this issue was raised, making a "remand" impossible. Under this circumstance, the trial court acted within its discretion in entering the verdict that the jury should have – and would have – entered, if it had followed the court's instructions.

{¶ 44} The fifth assignment of error is overruled.

{¶ 45} The judgment of the trial court will be affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Marc T. Ross
Wilfred L. Potter
Hon. Denise L. Moody