**[Cite as *State v. Nevarez-Reyes*, 2017-Ohio-2610.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   27047 |
| | : | |
| v. | : | T.C. NO. 14-CR-3659 |
| | : | |
| RENE NEVAREZ-REYES | : | (Criminal Appeal from Common |
| | : |  Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the 28th day of April, 2017.

. . . . . . . . . . .

LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
         Attorney for Plaintiff-Appellee

BROCK A. SCHOENLEIN, Atty. Reg. No. 0084707, 371 West First Street, Dayton, Ohio 45402
         Attorney for Defendant-Appellant

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} After the trial court overruled his motion to suppress, Rene Nevarez-Reyes pled no contest to aggravated possession of drugs (Schedule I or II, equal to or exceeding 100 times the bulk amount), a first-degree felony, and to a major drug offender specification. The trial court sentenced Nevarez-Reyes to a mandatory term of eleven years in prison and suspended his driver's license for three years.

{¶ 2} Nevarez-Reyes appeals from his conviction, challenging the trial court's denial of his motion to suppress. For the following reasons, the trial court's judgment will be affirmed.

### I. Factual and Procedural History

{¶ 3} In November 2015, the trial court held a hearing on the motion to suppress. The testimony of Detectives Josh Walters and Jason Leslie and Deputy Joseph Caito, which the trial court found to be credible, established the following facts.

{¶ 4} In October 2014, Detective Walters and Deputy Caito, both of the Montgomery County Sheriff's Office, and Detective Leslie of the Butler Township Police Department were members of the multi-agency Miami Valley Bulk Smuggling Task Force. Detective Walters was the lead investigator in this case.

{¶ 5} On Sunday, October 26, 2014, a confidential informant contacted the Task Force about a suspected load of narcotics. The informant told Detective Walters that he (the informant) had been contacted by a third-party in Mexico, who asked the informant to "go to Miller Lane. Go to Sam's Club. There's a truck in the lot. Meet with that guy. We need you to take the truck somewhere." The informant did not provide further information about the truck or the narcotics. According to Walters, the informant had

previously provided verifiable information "hundreds of times" and the information had proven reliable. Sometimes the tips were more specific, and other times, like this, the tips were vague.

{¶ 6} Walters contacted other members of the Task Force and informed them that there were "possibly drugs on Miller Lane." Deputy Caito drove to the area in his marked cruiser and with his canine partner, and he waited along Interstate 75. Detective Leslie and other officers also responded to the call out.

{¶ 7} Detective Walters drove in an unmarked vehicle to Sam's Club "to see if I could find a truck that possibly matched a description of somebody that was concealing narcotics or just hanging out, per se, waiting on somebody." Few vehicles were in the lot. Walters observed a red Ford Ranger "parked over all by itself," far away from the entrance, with one man inside "just looking around, constantly on the phone." Walters drove by the truck three times to read and reconfirm the license plate number. Walters checked the plate using a program called Accurint; the results indicated that the plate was registered to a 1998 Honda. Walters then asked via radio for another officer to check the license plate; Detective Leslie and Deputy Caito separately ran the plate.

{¶ 8} Deputy Caito described how he ran the number, as relayed by Detective Walters, through his onboard computer, which was referred to as his mobile data terminal (MDT). Using LEADS, Caito entered the abbreviation for Illinois (IL), the plate's numbers (1567557), and the registration expiration date from the registration sticker. Caito stated that if he had entered any information inaccurately, the system would have generated an error message. However, in this case, the system indicated that the vehicle was a 1998 Honda four-door vehicle, that it was registered to an individual (not Nevarez-Reyes) in

Elgin, Illinois, and that the registration had expired. Caito relayed the information to Detective Walters, who indicated that the vehicle with that license plate was a red Ford Ranger pickup truck.

{¶ 9} Detective Leslie also observed the license plate and heard the number as relayed by Walters, and his LEADS search also identified a 1998 Honda. Leslie testified, "I tried it a few different ways. There are a * * * few different parameters you can change for truck plates, passenger car, date of expiration. I ran it a number of ways to see if it came back different any other way." Leslie stated that they all came back the same, "except for I think I had the expiration date wrong on one, and it came back 'Not in file' or something of that sort."

{¶ 10} Detective Walters contacted his source, and asked the source to call his contact in Mexico and ask the contact to have the truck go somewhere else. The source called Walters back and said, "Hey, I told him." The source told Walters that the Mexican contact said, "It's a truck. He's on his way." Walters then saw the Ford Ranger leave the Sam's Club parking lot. Detective Leslie and another officer in separate unmarked vehicles began to follow the pickup. Detective Walters continued searching the Sam's Club lot to make sure that there was not another vehicle of concern. When no other vehicle left the lot, Walters contacted Deputy Caito about stopping the pickup.

{¶ 11} The pickup travelled south on Interstate 75. When the pickup truck passed Deputy Caito's location, Caito began to follow it. After visually confirming that the Ford Ranger had the same license plate that he had run, Deputy Caito initiated a traffic stop for "expired and fictitious registration." Caito activated his overhead lights, and the pickup truck pulled to the shoulder of the interstate. The driver, Nevarez-Reyes, was the

sole occupant.

{¶ 12} Deputy Caito approached Nevarez-Reyes, and Nevarez-Reyes provided his valid Illinois driver's license, proof of insurance, and valid registration for the truck. Upon inquiry, Nevarez-Reyes indicated that he was heading to his cousin's house. Caito noticed a small travel bag in the vehicle; the key to the vehicle was the only key on the keyring. After speaking with Nevarez-Reyes, the deputy asked dispatch to send another cruiser so that Caito's canine, Gunner, could conduct a free-air sniff of the Ranger. Within 10 to 12 minutes, Nevarez-Reyes was removed from his vehicle and patted down, and Caito walked Gunner along the truck, starting at the front left driver's side corner. Gunner alerted at the rear passenger side of the vehicle, at the separation between the bed and the cab of the truck.

{¶ 13} Caito participated in the search of Nevarez-Reyes's vehicle. He did not find contraband within the vehicle, but stated certain items were "flags," such as the presence of QuikSteel (a metal sealant) in the vehicle, tool marks on the bolts that hold the straps for the gas tank, and the fact that the straps themselves were not in the "factory position." Caito also located rubber gloves and an air chisel bit. Deputy Caito believed the vehicle was a "trap vehicle" used to transport drugs across the country. Detective Leslie testified that these items "can be used to make hidden or false compartments inside the vehicle."

{¶ 14} Deputy Caito contacted Detectives Walters and Leslie about the alert and what he had found, and Detective Walters decided to have the vehicle towed and to get a search warrant to search it. Deputy Caito issued a citation for fictitious tags and expired tags, and Nevarez-Reyes was transported by another officer to the sheriff's office

(District 7) so that he could be interviewed.

{¶ 15} Detective Leslie, with Walters's supervision, prepared a search warrant for the vehicle. After it was obtained, the gas tank was removed from the Ranger. Five individually-wrapped packages of suspected methamphetamine were located in the gas tank.

{¶ 16} Detectives Walters and Leslie interviewed Nevarez-Reyes at District 7 offices. Prior to questioning Nevarez-Reyes, Detective Walters informed Nevarez-Reyes of his *Miranda* rights using a pre-interview form. Leslie testified that Nevarez-Reyes agreed to speak with the officers, and he was not threatened or coerced. Nevarez-Reyes did not ask to speak to an attorney.

{¶ 17} In February 2015, as the prosecution of Nevarez-Reyes proceeded, the State discovered that Nevarez-Reyes's vehicle had been validly registered and that his registration had not expired. The State of Illinois maintains a vehicle registration system such that plate number 1567557 is assigned to a 1998 Honda, whereas plate number 1567557 B was assigned to the red truck at issue here. The license plate on Nevarez-Reyes's vehicle showed 1567557, but in a smaller font to the side, the plate contained the additional information of "B Truck." (*See* Def.'s Ex. B-E.)



The rear license plate displayed a small registration expiration tag showing an expiration in July 2015 for vehicle registration "1567557B." The paper registration document for the truck showed a current and valid registration for 1567557B. Nevarez-Reyes's driver's license and proof of insurance were in order.

Deputy Caito's testimony indicated that it is not typical or usual for officers at a traffic stop to run the information on the paper registration form once the information on the tag has been run.

{¶ 18} On February 27, 2015, Nevarez-Reyes was indicted for aggravated possession of drugs (100 times the bulk amount or more), with a major drug offender specification. Nevarez-Reyes subsequently moved to suppress the evidence seized from the vehicle and all statements that he made to police. He claimed that (1) the officers lacked a reasonable suspicion to stop his vehicle, (2) his detention after the stop was excessive and unreasonable, (3) the search of his vehicle was based on a defective warrant and exceeded the scope of the warrant; and (4) his statements were made in violation of *Miranda* and were not voluntarily given.

{¶ 19} In January 2016, after a hearing on the motion to suppress, the trial court denied the motion. The trial court reasoned:

The traffic stop on Defendant's vehicle for false/expired tags, while in factual error, was valid. The evidence presented at hearing, including this Court's assessment of witness credibility, demonstrates that the law enforcement officers were acting in good faith under a mistake of fact. There was no testimony indicating that the failure to include the letter B in the tag number was other than an isolated mistake. The mistake was not known to the officers until long after the stop.

Within approximately four to five minutes of the stop, Deputy Caito had deployed his certified narcotics sniffing K9 which alerted on the vehicle. The K9's alert established probable cause for the vehicle search. Given

the rapidity with which the K9 sniff and alert occurred, no prolongation of the traffic stop occurred.

The Court has conducted a four corner review of the warrant. Issuance of the warrant was based on significant evidence showing probable cause for a search of the vehicle, particular and specific as to the items sought and place to be searched.

Defendant's *Miranda* advisement was delivered via a written rights and waiver form. Defendant's recorded interview was preceded by a knowing, voluntary, and intelligent waiver of *Miranda* rights.

The initial questions posed to Defendant at the traffic stop, prior to the K9 alert, do not trigger *Miranda* because the traffic stop did not place Defendant in a custodial environment. On the totality of the circumstances presented, the handful of questions posed to Defendant at the stop regarding his past and future travel did not unduly prolong the stop and were based on a reasonable and articulable suspicion of criminal conduct. Deputy Caito knew of the reliable confidential informant's tip and the truck's behavior consistent with that tip. Deputy Caito made observations about Defendant's travel kit and ignition key (the absence of a hatch/trunk key). Those observations raised Deputy Caito's suspicions of possible criminal activity. With each vague or inaccurate piece of information supplied by Defendant regarding his travel and plans, the justifiable basis for additional investigation increased. The totality of the circumstances provided a reasonable and articulable basis for the questions unrelated to the specifics

of the traffic stop and those questions did not unduly prolong the stop. (Citations omitted.)

{¶ 20} In March 2016, Nevarez-Reyes pled no contest to the charged offense and specification. As stated above, the trial court sentenced him to a mandatory term of eleven years in prison and suspended his driver's license for three years.

{¶ 21} Nevarez-Reyes appeals from his conviction. His sole assignment of error claims that the trial court erred in overruling his motion to suppress.

## II. Motion to Suppress

{¶ 22} On appeal, Nevarez-Reyes challenges the trial court's ruling in two respects. First, he claims that the officers' "mistake of fact" did not justify the initial stop of his vehicle. Second, he asserts that promises made by Detective Walters during his interrogation at the police station overbore his will, as there appeared to be a "plain-and-simple quid pro quo – admissions in exchange for a reduced sentence, which would be controlled by the Detective." This second issue was not addressed by the trial court's decision.

{¶ 23} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley,* 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable

legal standard." *Id.*

### A. Stop of the Vehicle

{¶ 24} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, a police officer may stop and detain a motorist when he or she has a reasonable and articulable suspicion that the motorist has committed, is committing, or is about to commit any criminal offense, including a traffic offense, and no independent reasonable and articulable suspicion of other criminal activity is required. *State v. Stewart*, 2d Dist. Montgomery No. 19961, 2004-Ohio-1319, ¶ 13; *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996). A traffic violation gives an officer a reasonable articulable suspicion justifying a traffic stop, notwithstanding that the traffic stop may also have been a pretext to investigate suspected drug activity. *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 22; *State v. Wilcox*, 177 Ohio App.3d 609, 2008-Ohio-3856, 895 N.E.2d 597, ¶ 13 (2d Dist.); *State v. Cole*, 2d Dist. Montgomery No. 26576, 2015-Ohio-5295, ¶ 17.

{¶ 25} " 'Reasonable, articulable suspicion' is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.' " *State v. Fears*, 8th Dist. Cuyahoga No. 94997, 2011-Ohio-930, ¶ 5, citing *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *State v. Scott*, 2d Dist. Clark No. 2013 CA 104, 2014-Ohio-4963, ¶ 12. The existence of reasonable suspicion is determined by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist.

Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶ 26} Deputy Caito stopped Nevarez-Reyes for having an expired and "fictitious" vehicle registration. It is undisputed that, at the time of the stop, Neverez-Reyes's vehicle registration was not, in fact, expired and fictitious.

{¶ 27} Nevertheless, "the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.' " *Heien v. North Carolina*, __ U.S. __, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014), citing *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The Supreme Court has long recognized that searches and seizures based on a mistake of fact do not violate the Fourth Amendment, provided that the mistake was reasonable. *See id.*; *Illinois v. Rodriguez*, 497 U.S. 177, 183–186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *Hill v. California*, 401 U.S. 797, 802–805, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971).

{¶ 28} Here, three officers ran the out-of-state license plate number on Nevarez-Reyes's vehicle. Two of the officers – Detectives Walters and Leslie – separately viewed the license plate before running the number of the plate. All of the officers ran the number multiple times. For Detective Walters and Officer Caito, the information repeatedly came back to a 1998 Honda. One of Detective Leslie's searches resulted in an error message, but his other searches also indicated that the plates were expired and belonged on a 1998 Honda. It was not apparent to any of the officers that the "B" was a necessary part of the search terms or that the Illinois vehicle registration system was designed such that two vehicles could have the same plate number 1567557. The

officers did not learn until several months later that Nevarez-Reyes's vehicle registration was not expired or fictitious.

{¶ 29} Based on the circumstances, Officer Caito did not act unreasonably when he stopped the Ford Ranger that Nevarez-Reyes was driving. Caito had no reason to believe that he had entered an incomplete license plate number into his computer; Caito had not received an error message and he was unaware of the particularities of the Illinois vehicle registration system. The deputy visually confirmed the license plate number prior to stopping the Ranger; the "B" at the end on the number was smaller than the numbers, and it was not an obvious part of the license plate number. Caito's search result was consistent with the results that both Detectives Walters and Leslie had also received when they independently ran the license plate number. Although the result was, in fact, erroneous, the officers reasonably relied on the result showing that the vehicle's registration was expired and fictitious. And, given that he and other officers had already run the license plate prior to the stop, Deputy Caito did not act unreasonably when he decided not to rerun the license plate based on the paperwork in the vehicle.

### B. Statements Made to the Police at the Station

{¶ 30} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself or herself. In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been followed. *In re R.L.*, 2014-Ohio-5065, 23 N.E.3d 298, ¶ 17 (2d Dist.), citing *In re Haubeil*, 4th Dist. Ross No. 01CA2631, 2002-Ohio-4095, ¶ 9.

**{¶ 31}** Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are distinct issues. *State v. Eley*, 77 Ohio St.3d 174, 178, 672 N.E.2d 640 (1996); *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005–Ohio–305. Regardless of whether *Miranda* warnings were required and given, a defendant's statement may have been given involuntarily and thus be subject to exclusion. *Kelly* at ¶ 11.

**{¶ 32}** A defendant's statements to police after a knowing, intelligent, and voluntary waiver of the individual's *Miranda* rights are presumed to be voluntary. *Miranda*, *supra*. "The *Miranda* presumption applies to the conditions inherent in custodial interrogation that compel the suspect to confess. It does not extend to any actual coercion police might engage in, and the Due Process Clause continues to require an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding his confession." *State v. Porter*, 178 Ohio App.3d 304, 2008-Ohio-4627, 897 N.E.2d 1149, ¶ 14 (2d Dist.), citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

**{¶ 33}** "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). *See also State v. Belton*, Ohio Sup. Ct. Slip Opinion No. 2016-Ohio-1581, ¶ 107.

{¶ 34} "[F]alse promises made by police to a criminal suspect that he can obtain lenient treatment in exchange for waiving his Fifth Amendment privilege so undermines [sic] the suspect's capacity for self-determination that his election to waive the right and incriminate himself in criminal conduct is fatally impaired. His resulting waiver and statement are thus involuntary for Fifth Amendment purposes. * * * The simple result is that officers must avoid such promises, which are not proper tools of investigation." *State v. Petitjean*, 140 Ohio App.3d 517, 534, 748 N.E.2d 133 (2d Dist.2000). *See also State v. Western*, 2015-Ohio-627, 29 N.E.3d 245, ¶ 39 (2d Dist.).

{¶ 35} In contrast to misstatements of law and false promises of leniency, admonitions to tell the truth are not unduly coercive. *State v. Cooey*, 46 Ohio St.3d 20, 28, 544 N.E.2d 895 (1989); *Western* at ¶ 42. A police officer's assertion to the suspect that he or she is lying or that the suspect would not have another chance to tell his or her side of the story does not automatically render a confession involuntary. *State v. Knight*, 2d Dist. Clark No. 2004 CA 35, 2008-Ohio-4926, ¶ 111. "Similarly, assurances that a defendant's cooperation will be considered or that a confession will be helpful do not invalidate a confession." *State v. Stringham*, 2d Dist. Miami No. 2002-CA-9, 2003-Ohio-1100, ¶ 16. Even a "mere suggestion that cooperation may result in more lenient treatment is neither misleading nor unduly coercive, as people 'convicted of criminal offenses generally are dealt with more leniently when they have cooperated with the authorities.' " *Id.*, quoting *State v. Farley*, 2d Dist. Miami No. 2002-CA-2, 2002-Ohio-6192; *see Belton* at ¶ 111 ("Officers may discuss the advantages of telling the truth, advise suspects that cooperation will be considered, or even suggest that a court may be lenient with a truthful defendant.").

{¶ 36} In general, the State has the burden to show by a preponderance of the evidence that a defendant's confession was voluntarily given. *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978).

{¶ 37} We have reviewed the exhibits submitted by the parties, including the audio recording of the interview at the sheriff's office (State's Exhibit 11). The entire recording of the interview is approximately 20 minutes long. At the time of the interview, Nevarez-Reyes was 22 years old and had completed high school. He was from the Chicago area. Detective Walters noted during the interview that Nevarez-Reyes had only minor offenses in the past.

{¶ 38} At the beginning of the interview, Detective Walters informed Nevarez-Reyes that he and Detective Leslie wanted to talk about the drugs in the vehicle. Walters told Nevarez-Reyes that this was a "no bull crap kind of case," noting that Nevarez-Reyes was the sole occupant of a vehicle found to contain drugs. Walters stated that the issue came down to how much time Nevarez-Reyes wanted to "knock down" his sentence and what could Nevarez-Reyes "put on the table" to help the officers. At that juncture, Walters read Nevarez-Reyes his *Miranda* rights using a pre-interview form. Nevarez-Reyes orally indicated that he understood his rights, and he initialed on the form next to each right. Nevarez-Reyes agreed to speak with the officers, and he initialed next to the waiver of rights paragraph on the form.

{¶ 39} After Nevarez-Reyes waived his *Miranda* rights (approximately 6 minutes into the interview), Detective Walters stated, "I want to help you as much as I can, because someone your age, I don't want to see you go to prison for the rest of your life." He told Nevarez-Reyes that he (Nevarez-Reyes) had "a chance to help yourself out," and

that the officer would help him if Nevarez-Reyes wanted to help himself. The officers told Nevarez-Reyes that he faced mandatory terms of 11 years for both drug possession and drug trafficking, plus a potential additional 3 years for a major drug offender specification. The officers indicated that Nevarez-Reyes was starting at 25 years and it could "only go down" from there. Walters emphasized that he realized that Nevarez-Reyes was paid to transport the drugs, and that the detectives wanted information about the people in charge. Walters stated that he could not make an agreement for five years or no prison time if Nevarez-Reyes cooperated; rather, the detective would "have to see what [Nevarez-Reyes] can put on the table."

{¶ 40} For the next 10 minutes or so, the detectives asked Nevarez-Reyes what he knew about the drug transactions of which he was a part. Nevarez-Reyes answered the questions. At the conclusion of the interview, Detective Walters told Nevarez-Reyes that he (Walters) would inform the prosecutors that Nevarez-Reyes had been 100 percent cooperative and had given as much information that he (Nevarez-Reyes) could. Walters stated that he could not make any agreement today and that Nevarez-Reyes would need to go to jail, but the detective would speak with prosecutors the following day. Walters stated that he would tell Nevarez-Reyes's attorney and the judge at sentencing that Nevarez-Reyes had been cooperative and that Nevarez-Reyes would receive less time than someone who had not cooperated.

{¶ 41} As an initial matter, other than the fact that Nevarez-Reyes was in police custody, the circumstances of the interrogation were not inherently coercive. Nevarez-Reyes was 22 years old and had a 12th-grade education. The interview started at approximately 6:00 p.m., and the entire interview, including the reading and waiver of his

*Miranda* rights, lasted just under 20 minutes.

**{¶ 42}** As for the detective's statements that Nevarez-Reyes could "help himself" and that the detective could not make an agreement for a five-year sentence or no prison sentence, the detective's statements did not promise a reduced sentence in exchange for a confession by Nevarez-Reyes.   As we stated in *State v. Heisey*, 2015-Ohio-4610, 48 N.E.3d 157 (2d Dist):

> [W]e have said that "assurances that a defendant's cooperation will be considered or that a confession will be helpful do not invalidate a confession."   "[A] mere suggestion that cooperation may result in more lenient treatment is neither misleading nor unduly coercive, as people 'convicted of criminal offenses generally are dealt with more leniently when they have cooperated with the authorities.' "   "Likewise, an investigator's offer to 'help' if a defendant confesses is not improper."

(Citations omitted.) *Heisey* at ¶ 15.   Here, Detective Walters emphasized the importance of Nevarez-Reyes's cooperation and that Nevarez-Reyes may be able to receive more lenient treatment, depending on the information that Nevarez-Reyes could provide.   But the detective did not promise that Nevarez-Reyes would receive leniency prior to Nevarez-Reyes's statements.   At the conclusion of the interview, Walters did say that Nevarez-Reyes would receive less time than someone who had not been cooperative, but no further statements were made following this comment.   Considering the totality of the circumstances, the questioning of Nevarez-Reyes was not unlawfully coercive.

**{¶ 43}** It is further noted that at the suppression hearing, though raised in the suppression motion, Nevarez-Reyes did not assert, through direct examination, cross

examination, argument or otherwise, that his statements were the result of his will being overborne by a false promise of lenient treatment. This supports the conclusion that Nevarez-Reyes' statements, under the totality of circumstances, including the difficult factual situation Nevarez-Reyes faced, Walters' mild, non-intimidating demeanor during the less than 20 minute interview, and Nevarez-Reyes' prompt cooperation, were not induced by Walters' reference to a reduced sentence. This record, in short, supports the conclusion that Nevarez-Reyes' Fifth Amendment waiver was voluntary.

{¶ 44} The sole assignment of error is overruled.

### III. Conclusion

{¶ 45} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

Hall, P.J., concurring.

{¶ 46} I agree with, and concur in, the lead opinion's conclusions that the stop of the appellant's vehicle was supported by probable cause, though based on a later-discovered mistake of fact. I also agree that the totality of the circumstances, after consideration of all the evidence in the record, supports the trial court's denial of the motion to suppress. I write separately to note what was not developed by the record, not addressed with evidence from the appellant, not argued before the trial court, not transcribed into written form, most likely not reviewed by the trial court, and not included in the trial court's decision.

{¶ 47} I acknowledge that the appellant's boilerplate motion to suppress generally raised a potential issue of whether he properly was advised of his *Miranda* rights and whether "because of coercive police questioning, [his] statements were not voluntarily

given and must be suppressed." But virtually the entire motion hearing, contained in 226 pages of transcript, focused on whether the traffic stop of the appellant's vehicle was constitutional. Only in three pages, 183 to 185, did the State introduce evidence that the appellant was advised of his *Miranda* rights by use of a written form, that he was not threatened or coerced, and that the interview was recorded on a DVD that was introduced as an exhibit. There was no request, by either side, for the court actually to review the video. The defense did not ask a single question, not one, about the rights or about the interview. The appellant did not testify that his will was overborne by police tactics. Defense counsel's oral argument at the end of the hearing did not mention the rights waiver or the interview. Consequently, the trial court's decision did not address any factual or legal issues that might arise in the video recording and the court did not even refer to it.

{¶ 48} In my opinion, we need not address issues that were not tried before the trial court. However, even if we do, the totality of the circumstances fails to show the appellant's will was overborne or that his statements were involuntary.

FROELICH, J., dissenting.

{¶ 49} I agree with the majority's conclusion that Deputy Caito constitutionally stopped Nevarez-Reyes's vehicle based on his reasonable, but mistaken, belief that the vehicle's license plates were expired and fictitious. I dissent, however, from the conclusion that Detective Walters's statements to Nevarez-Reyes during the interrogation at the police station did not overbear Nevarez-Reyes's will and render his statements at the police station involuntary.

{¶ 50} Nevarez-Reyes was a 22-year-old from Chicago with a high school

education. Although his statements during the interview indicated that he previously had driven drugs from Chicago to other states, Nevarez-Reyes had only minor criminal offenses in the past.

{¶ 51} Prior to informing Nevarez-Reyes of his *Miranda* rights, Detective Walters informed Nevarez-Reyes that he and Detective Leslie wanted to talk about the drugs in the vehicle. Detective Walters pointed out that Nevarez-Reyes was the sole occupant of a vehicle found to contain a large quantity of drugs. Walters told Nevarez-Reyes, "The only thing we want from you is the amount of time you want to knock off your sentence, okay, and what you can do, what you can put on the table, what you can produce, because that's what it's gonna come down to as far as how much time you're gonna get reduced and where we're gonna go from here." Thus, prior to giving Navarez-Reyes his *Miranda* rights, Detective Walters indicated to Nevarez-Reyes that making incriminating statements would reduce any sentence that he would receive.

{¶ 52} Walters then informed Nevarez-Reyes of his *Miranda* rights using a waiver of rights form. After explaining and ensuring Nevarez-Reyes's understanding of each of the rights, the detective read verbatim the waiver of rights paragraph at the bottom of the page. Walters explained the term "coercion," saying that no one in the interview room was "holding a gun" to Nevarez-Reyes and that the officers were "not pressuring you to talk." However, the detective further said, "This can only help you; it can't help us. * * * Certainly it could, depending on what you can do." Nevarez-Reyes agreed to waive his *Miranda* rights and he signed the form.

{¶ 53} The United States Supreme Court has addressed the voluntary waiver of *Miranda* rights, stating:

*** *Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

(Citations omitted.) *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *see Berghuis v. Thompkins*, 560 U.S. 370, 382-383, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). Here, the detective's statements to Nevarez-Reyes prior to and during the issuance of *Miranda* warnings suggested that one consequence (in this case, benefit) of a waiver of Nevarez-Reyes's rights would be reduction in his sentence. Although Nevarez-Reyes was accurately informed of his *Miranda* rights, the record does not reflect, when considering the totality of the circumstances, that Nevarez-Reyes fully understood the actual consequences of his waiver.

{¶ 54} After Nevarez-Reyes waived his *Miranda* rights, Detective Walters stated, "I want to help you as much as I can, because someone your age, I don't want to see you go to prison for the rest of your life." The detectives also incorrectly told Nevarez-Reyes that he faced an aggregate 25 years in prison based on his conduct. The officers stated

that Nevarez-Reyes was starting at 25 years and it could "only go down" from there. Detective Walters told Nevarez-Reyes that he understood that Nevarez-Reyes was paid to transport the drugs, just like many other people they stop under similar circumstances, and the detective indicated that law enforcement could potentially "use" Nevarez-Reyes, but only if Nevarez-Reyes did not lie. The detective stated, "There's a chance -- I can't make the agreement that, you know, I'm gonna give you five years if you cooperate or I'm gonna give you no time, okay? But I gotta look and see exactly what you can put on the table, how much you can put on the table, and we can go from there."[1] Nevarez-Reyes proceeded to tell the detectives what he knew about the drug transactions of which he was a part.

{¶ 55} The detective's statements that Nevarez-Reyes could "help himself" and obtain a reduced sentenced if Nevarez-Reyes provided information induced Nevarez-Reyes to make incriminating statements. After Nevarez-Reyes waived his *Miranda* rights, Walters inaccurately made statements about the sentence Nevarez-Reyes faced, first saying that the detective did not want to see him "go to prison for the rest of your life" and later saying that Nevarez-Reyes faced a mandatory 25 years. Even assuming that it were reasonable for Walters to state that Nevarez-Reyes faced separate, consecutive sentences for aggravated possession and trafficking in drugs, there is no separate penalty for a major drug offender specification. R.C. 2925.11(C)(1)(e).

---

[1] The audio recording of the interview was not transcribed, and it is unclear whether Detective Walters stated, "There's a chance I can make the agreement [for five years or no time] * * *," or whether he said, "There's a chance -- I can't make the agreement [for five years or no time] * * *." Under either interpretation, the detective implied that Nevarez-Reyes would receive leniency of some amount, but the specific deal depended on what Nevarez-Reyes had to say.

{¶ 56} Moreover, Detective Walters's statements to Nevarez-Reyes were not merely "assurances that a defendant's cooperation will be considered," an offer of help, or statements that cooperation *may* result in more lenient treatment. Detective Walters indicated to Nevarez-Reyes that he (Nevarez-Reyes) *would receive* more lenient treatment if he (Nevarez-Reyes) provided information; the quality of the information would affect the amount of the sentence reduction. Although the detective stated that he could not make an agreement for a five-year sentence or no prison sentence, Walters unequivocally stated that Nevarez-Reyes would receive some benefit by providing helpful, i.e. incriminating, information. Walters stated to Nevarez-Reyes that if Nevarez-Reyes wanted to help himself, Walters would help him.

{¶ 57} By the end of the conversation, the detective told Nevarez-Reyes that he (Nevarez-Reyes) would have to go to jail, but that he would review the matter with prosecutors the next day and would say that Nevarez-Reyes had been "100 percent cooperative" and had told the detectives "everything you could." Walters further said that, when it comes time for sentencing, he would tell "the court and your attorney that you were cooperative" and that he would "ask for a reduced sentence."[2] The officer did not state, until after Nevarez-Reyes had already confessed and provided additional information, that he (Walters) lacked the authority to make any deal regarding Nevarez-Reyes's sentence. To the contrary, Walters's implied that *he* – not the prosecutor --

---

[2] The trial court proceeded directly to sentencing after the plea, because, as defense counsel stated, "[t]here's really no option for the Court as far as sentencing except for the fine." No presentence investigation was conducted. There is no indication that Detective Walters was present at the plea and sentencing hearings; neither the prosecutor nor the detective made any statement to the court regarding Nevarez-Reyes's cooperation with law enforcement officers.

could make an agreement if Nevarez-Reyes cooperated, but that Walters could not make a specific deal for five years or no time until after he heard what Nevarez-Reyes "put on the table." It was only after Nevarez-Reyes has said "everything [he] could" that the detective said, "I can't make an agreement today" and that he would talk to the prosecutor.

**{¶ 58}** Considering the totality of the circumstances, Detective Walters told Nevarez-Reyes, both prior to and after *Miranda* warnings, that Nevarez-Reyes would receive leniency – as opposed to a recommendation by Walters to the prosecutor for leniency − if Nevarez-Reyes provided incriminating and additional information. I would conclude that Nevarez-Reyes's will was overborne by the detective's statements regarding leniency, rendering Nevarez-Reyes's statements involuntary.

. . . . . . . . . . . . .

Copies mailed to:

Lynne R. Nothstine
Brock A. Schoenlein
Hon. Mary L. Wiseman